1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TAMETRIA NASH-PERRY, | Case No.: 1:18-cv-01512 JLT |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CITY OF BAKERSFIELD, OFFICER ALEJANDRO PATINO, and nominal defendant JASON OKAMOTO, | (Doc. 61) |
| Defendants. | |
| JASON OKAMOTO, individually and as successor-in-interest to CHRISTOPHER OKAMOTO, and Z.S., by and through her guardian ad litem, Brittney Saucedo, | |
| Plaintiffs, | |
| v. | |
| CITY OF BAKERSFIELD and OFFICER ALEJANDRO PATINO, | |
| Defendants. | |

Tametria Nash-Perry, Jason Okamoto, and minor Z.S. seek to hold Bakersfield Police Officer Alejandro Patino and the City of Bakersfield liable for the fatal shooting of Christopher Okamoto under federal and state law. (*See generally* Doc. 38.) Defendants argue Plaintiffs are unable to succeed upon

1

their claims and seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 61.)  The Court heard the oral arguments of the parties at hearing on August 16, 2021.  Because there are genuine issues of material facts remaining and Defendants have not demonstrated their entitlement to judgment, the motion is **GRANTED IN PART**.

## I.      Background[1]

The decedent, Christopher Okamoto, was 21 years old and lived in an apartment with his girlfriend Britney Saucedo and her daughter Z.S.  (*See* Doc. 65 at 166; JSF 6, 8.)  The parents of the decedent—Tametria Nash-Perry and Jason Okamoto—report he treated Z.S. as his own daughter, though he expressed doubts that he was the father to Mr. Okamoto.  (*See* Doc. 61-4 at 22, J. Okamoto Depo. 13:21- 14:11; JSF 7.)  In fact, the decedent was not the biological father of Z.S., who was born on December 21, 2017.  (*See* Doc. 61-4 at 26; JSF 6.)

Ms. Nash-Perry and Mr. Okamoto report they gave financial assistance to their son after he moved to Bakersfield in the summer of 2018.  (*See* Doc. 61-4 at 13-14, 20; Nash-Perry Depo. 43:4- 44:1; J. Okamoto Depo. 11:2-15.)  Mr. Okamoto explained he paid the down payment for the decedent's apartment as well as "half of the rent."  (*Id.* at 20, J. Okamoto Depo. 11:2-15.)  Ms. Nash-Perry reported she gave money to the decedent when he asked, and "from time to time… [would] hand him some cash."  (*Id.* at 13, Nash-Perry Depo. 43:7-18.)

### A.      Underlying incident

On August 19, 2018, the decedent, Britney Saucedo and Z.S were in their apartment located at 4809 Hahn Avenue, Apartment No. 46.  (JSF 8.)  Ms. Saucedo drank "one tall can of [cheap] beer/malt liquor," which made her feel tired.  (JSF 9, Doc. 73-1 at 6; *see also* Saucedo Depo. 18:3-8.)  The decedent "had two or three" of the drinks, and Ms. Saucedo observed that "[he] was drunk, slurring his words."  (JSF 9.)  They argued, and cans were "thrown around."  (JSF 10.)  In addition, the decedent pushed Ms. Saucedo at one point.  (*Id.*)

---

[1] The section is a summary of the undisputed facts as well as the parties' contentions in the matter.  The parties submitted a "Joint Statement of Undisputed Material Facts," which are identified as "UMF."  (Doc. 61-3.)  The parties also each prepared separate statements of facts to support their respective positions.  Facts prepared by Defendants that were either admitted by Plaintiffs or not disputed by the evidence cited are identified as "DSF" for Defendants' Separate Fact.  (Doc. 61-2; Doc. 66.)  Likewise, facts prepared by Plaintiffs that were either admitted or not disputed by the evidence cited by Defendants are identified as "PSF" for Plaintiffs' Separate Facts.  (Doc. 67.)

Adjacent neighbors, Edward White and Melissa Contreras, could hear "arguing from the Okamoto apartment." (JSF 11, 12.)  Mr. White reported he heard the arguing earlier in the day and later was "awakened by their arguing."  (JSF 12; PSF 10, Doc 73-3 at 4.)  "As the argument continued to escalate, Mr. White decided to contact the police to diffuse the situation."  (PSF 10, Doc. 73-3 at 4.)  "Mr. White never believed that Saucedo was being choked, nor did he believe anyone inside Mr. Okamoto's apartment was in immediate danger."  (PSF 11.)

During the argument, Timothy Brown, another neighbor who lived in the apartment below the decedent, went upstairs to speak with the decedent.  (PSF 5, Doc. 73-3 at 3.)  Ms. Saucedo reports that "[a]t some point after Chris came back inside…, he fell asleep by the bed."  (Doc. 68 at 2, Saucedo Decl. ¶ 6.)  Mr. Brown reports he did not hear any more noise or movement coming from the Okamoto appointment until later when the police arrived. (*See* Doc. 65 at 149, Brown Depo. 24:16-25:17.)

At approximately 11:27 p.m., Bakersfield Police Officers Alejandro Patino and Eric Celedon "were dispatched 4809 Hahn Street for a call to service related to a domestic violence incident."  (DSF 7; *see also* PSF 1.)  "Dispatch advised the officers that a male was possibly choking a female."  (*Id.*)

"Officer Celedon was the first officer to arrive at the apartment complex and Officer Patino arrived shortly thereafter at approximately 11:34 p.m."  (JSF 13.)  The officers were not directed to a particular apartment by dispatch and while they were trying to determine which apartment was at issue, Mr. White went down to meet them. (Doc. 61-4 at 49) Mr. White gestured to the decedent's apartment, but the officers did not question him about the disturbance. (*Id.*) They allowed Mr. White to return to his apartment before they ascended the stairs. (*Id.*)

"Patino and Celedon proceeded up the staircase toward Christopher Okamoto's apartment."  (JSF 15.)  Although Patino and Celedon did not discuss "a tactical strategy" prior to approaching the apartment, Patino was designated to be the officer "who would make contact at the door."  (PSF 12; JSF 16.)  Patino stood on the landing outside the apartment, while Celedon stood on the top stair of the staircase.  (Doc. 61-4 at 77, 104; Celedon Depo. 21: 4-11; Patino Depo. 53:17-21.)  When he approached the door, Officer Patino had unholstered his gun and was using the flashlight mounted on it to illuminate the door. (Doc. 64-1 at 50; Doc. 65 at 127; Doc. 65-4 at 187; Doc. 75 at 6-7)

Ms. Saucedo reports[2] that she and the decedent "were awakened by loud banging in [their] door." (PSF 15; Doc. 68 at 2, Saucedo Decl. ¶ 7.)  According to Ms. Saucedo, she "never heard anyone outside of the door announce they were the police." (Doc. 68 at 2, ¶ 9.)  In addition, she reports that she "heard Chris continuously ask, who was at [the] door, or words to that effect," and she "perceived that Chris did not know who was at the door either, let alone the police." (*Id.*, ¶¶ 9-10.)  Similarly, their neighbor Mr. White reports he heard the decedent "scream … who the fuck is that at my door," "who is that knocking on my damn door," or words to that effect. (Doc. 65 at 127-28, White Depo. 25:24-26:1, 26:14-22.)  Officer Patillo testified that the decedent asked more than once words to the effect of "who is at the door?" (Doc. 61-4 at 110-11, Patino Depo. 61:23-62:10; Doc. 61-4 at 111, Patino Depo. 62:12-20.)  Ms. Saucedo reports, "The person or persons outside the door did not respond any of the times Chris asked who was at [the] door banging," and she "thought [they] were being robbed." (Doc. 68 at 3, Saucedo Decl. ¶¶ 11, 13.)

Ms. Saucedo reports they "lived in a high crime area" and she was in fear of her life and her daughter's life. (*Id.*, ¶¶ 14-15; Saucedo Depo. 23:10-14.)  Ms. Saucedo observed the decedent retrieve a BB gun, and she told the decedent to "just open [the door] and see who it is." (Saucedo Depo. 23:10-14,24:17-19.)  In the meantime, Ms. Saucedo ran to the bathroom with her daughter and locked herself inside. (PSF 22; *see also* Saucedo Depo. 24:24-25:1, 25:23- 26:4.)

Patino asserted that from the time he first rang the doorbell, heard the footsteps back and forth three times, and then heard the door unlocking, "probably about one to two minutes" had passed. (Id. at 112, Patino Depo. 63:10-17.)  He stated he heard approaching footsteps and "the door handle [began] to turn very slowly." (Doc. 61-4 at 116, Patino Depo. 69:1-7.)  Patino stated, "As soon as that doorway [began] to open, [he] saw the muzzle of a black firearm" that was "pointed at [his] head." (*Id.*, Patino Depo. 16-25.)  As soon as the door opened, Mr. White heard the officer say, "gun or . . . he has a gun," followed by the sound of "boom, boom, boom, boom, boom, boom" of the officer's gun. (Doc. 64-1 at 52-53.)

According to Patino, once he saw the muzzle of the weapon, the door opened "very quickly,"

---

[2] The parties present differing accounts of what occurred after the police approached the apartment.  Thus, for purposes of this motion, the Court adopts the version of the events most favorable to the plaintiffs.

and the decedent was "standing in … a one-handed shooter position," with "his right arm fully extended out and [he had] the firearm pointed … directly at [him], at [his] head."  (*Id.*)  Patino said, "The only thing I could do was step over to the left to try to get offline from where he's aiming that firearm, and then I begin to fire."  (*Id.* at 117, Patino Depo. 70:1-6.)  He fired six rounds in his first volley.  (*Id.* at 120, Patino Depo. 73:22-25.)  Patino testified that "[a]fter the first volley, [the decedent's] position changed," as the decedent "took a step back, back away from [Patino]."  (Patino Depo. 96:4-97:4.)  Patino fired two shots in a second volley.  (Depo. 74:1-5.)  The decedent "was shot six separate times during the incident."  (PSF 43, Doc. 73-3 at 12-13.)  After the shooting, the decedent was "laying just inside of the doorway on his back, arms up near his head, with a firearm near his right hand."  (Celedon Depo. 45:1-5.)

## B.    Findings of the Medical Examiner

Dr. Robert Whitmore, a forensic pathologist, performed the autopsy on August 24, 2018, and prepared a report detailing his findings.  (Doc. 65 at 175-180.)  Dr. Whitmore noted there were "six gunshot wounds on the body and a graze gunshot wound of the right cheek."  (*Id.* at 177.)  Dr. Whitmore observed there were "[f]our penetrating and perforating gunshot wounds of the anterior left trapezius, anterior left shoulder, and upper anterior left arm associated with multiple fragment wounds;" and "[t]wo penetrating gunshot wounds of the left anterior chest and associated with multiple fragment wounds."  (*Id.* at 175; *see also* PSF 51, Doc. 73-3 at 14.)  Dr. Whitmore found "five exit wounds located on the upper outer left back, posterior left shoulder and posterior upper left upper arm."  (*Id.* at 177.)  Two shots struck the decedent "in the outer left chest in a front to back[,] left to right (westbound direction) trajectory."  (PSF 46; Doc. 65 at 177 ¶ D.)  In Dr. Whitmore's opinion the bullets that struck the decedent in the left trapezius, left shoulder, and left upper arm traveled in a "front to back" direction.  (*See* PSF 48; Doc. 65 at 177 ¶ D.)

Dr. Whitmore located "[a] deformed medium-caliber bullet … in [the] T3 vertebra" and a bullet jacket on "the left side of T8 vertebra," and recovered "[a] deformed apparent medium- caliber lead core … from [the] T8 ."  (Doc. 65 at 177 ¶ C.)  Dr. Whitmore testified that the bullet "core went through the vertebra," and "a bullet through the vertebra is going to cause loss of function."  (*Id.* at 82, Whitmore Depo. 75:2-9.)  Further, Dr. Whitmore testified that a transection of the spinal cord at the T3

level—which he found during the autopsy—would "cause probable immediate collapse."  (*Id.* at 83-84, Whitmore Depo. 76:17- 77:19.)  Plaintiffs contend the physical evidence identified by Dr. Whitmore contradicts Patino's claim that the decedent pointed the BB gun at Patino's head with his right hand, while in a one-handed shooter position.  (*See* PSF 61.)

## C.    Procedural History

On October 31, 2018, Ms. Nash-Perry initiated this action by filing a complaint asserting constitutional claims on her own behalf and constitutional, state law, and survivorship claims on behalf of the decedent.  (Doc. 1.)  In addition, Mr. Okamoto and Z.S. filed a complaint on August 14, 2019.  (*See* Doc. 1, Case No. 1:19-cv-1125-LJO-JLT.)  Mr. Okomoto sought to state claims on his own behalf and as the decedent's successor-in-interest, while Z.S. sought to state claims in her individual capacity.  (*Id.*)  The Court consolidated the actions on November 8, 2019.  (Doc. 42.)

Ms. Nash-Perry identified the following claims for relief in her Fourth Amended Complaint: (1) unreasonable use of deadly force; (2) violation of substantive due process; (3) interference with familial relationship and freedom of association; (4) battery; (5) negligence; (6) *Monell* liability for an unconstitutional custom, practice, or policy; (7) *Monell* liability for inadequate training; and (8) *Monell* liability for ratification of wrongful acts.  (*See generally* Doc. 38 at 1, 10-28.)  Similarly, Mr. Okamoto and Z.S. identified the following claims for relief against the City of Bakersfield and Officer Patino: (1) excessive force in violation of the Fourth and Fourteenth Amendments, (2) violation of substantive due process under the Fourteenth Amendment, (3) conspiracy to violate civil rights, and (4) wrongful death under California law.  (Doc. 1, Case No. 1:19-cv-1125-LJO-JLT.)

On June 16, 2021, the parties stipulated to dismiss several causes of action with prejudice.  (Doc. 59.)  Ms. Nash-Perry agreed to dismiss the Sixth, Seventh, and Eighth causes of action asserting *Monell* liability.  (*Id.* at 2.)  Mr. Okamoto and Z.S. agreed to dismiss their claims against the City of Bakersfield for violations of the Fourth and Fourteenth Amendments.  (*Id.*)  In addition, Mr. Okamoto and Z.S. dismissed their third cause of action for conspiracy to violate civil rights against both defendants.  (*Id.*)  The Court approved the stipulation and dismissed the claims with prejudice on June 21, 2021.  (Doc. 60.)

Defendants filed the motion for summary judgment now pending before the Court on July 8,

1    2021.  (Doc. 61.)  Plaintiffs filed their opposition to the motion on July 27, 2021 (Doc. 64), to which

2    Defendants filed a reply on August 6, 2021 (Doc. 73).

3    **II.     Legal Standards for Summary Judgment**

4            The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order

5    to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio*

6    *Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is

7    "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

8    Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial

9    summary judgment, when there is no genuine issue of material fact as to a particular claim or portion

10   of that claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir.

11   1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination,

12   even of a single claim . . .") (internal quotation marks, citation omitted).  The standards that apply on a

13   motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ.

14   P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

15           Summary judgment, or summary adjudication, should be entered "after adequate time for

16   discovery and upon motion, against a party who fails to make a showing sufficient to establish the

17   existence of an element essential to that party's case, and on which that party will bear the burden of

18   proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial

19   responsibility" of demonstrating the absence of a genuine issue of material fact.  *Id.,* 477 U.S. at 323.

20   An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the

21   non-moving party, while a fact is material if it "might affect the outcome of the suit under the

22   governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Wool v. Tandem*

23   *Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication of

24   a claim is appropriate by "informing the district court of the basis of its motion, and identifying those

25   portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

26   affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."

27   *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

28           If the moving party meets its initial burden, the burden then shifts to the opposing party to

1   present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e);

2   *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some

3   metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of

4   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

5   contention that a factual dispute exits.  *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  Further, the opposing

6   party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that

7   "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

8   versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d

9   626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the

10  nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

11          The Court must apply standards consistent with Rule 56 to determine whether the moving

12  party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of

13  law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary

14  judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285

15  F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854

16  F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the

17  nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.

18  *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

19  **III.    Evidentiary Objections**

20          Defendants have raised several objections to the evidence submitted by Plaintiffs in support of

21  their opposition to summary judgement, including the discovery responses from Ms. Nash-Perry, the

22  report of James Bryant, the declaration of Brittney Saucedo, and the autopsy photos.  (Doc. 73-4.)

23          **A.    Responses to Interrogatories- Exhibit 15**

24          Plaintiffs submitted Ms. Nash-Perry's "Responses to Defendant Alejandro Patino's

25  Interrogatories, Set No. One" as Exhibit 15 in support of their opposition to summary judgment. (*See*

26  Doc. 65 at 194-98.)  Defendants object to this evidence because the discovery responses were not

27  verified, neither when served upon Defendants nor in support of the opposition.  (Doc. 73-4 at 2; *see*

28  *also* Doc. 73-1 at 2, Cohen Decl. ¶ 1.)  Because the responses to interrogatories were not signed under

oath, Defendants request the Court disregard this evidence in evaluating the merits of the motion for summary judgment.

Under Rule 33 of the Federal Rules of Civil Procedure, a party answering interrogatories has an affirmative duty to provide a full and complete response.  Fed. R. Civ. P. 33(b)(3)-(4).  In addition, Rule 33(b)(3) requires that answers to interrogatories be verified: "Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing *under oath*." *Id.* (emphasis added).  Thus, for discovery responses to be admissible evidence, they must be signed under oath.  *See Blevins v. Marin,* 2013 WL 718869, at *1 (E.D. Cal. Oct. 11, 2013) ("all responses to interrogatories and requests for admission must be verified—that is, bear plaintiff's signature attesting under penalty of perjury that his responses are true and correct—in order to be an admissible form at summary judgment").

When discovery responses are not verified or signed under oath, courts have repeatedly determined the unverified discovery may not be considered by a court evaluating a motion for summary judgment.  *See, e.g., Blevins v. Marin,* 2013 WL 718869, at *1; *Wilson v. Frito-Lay N. Am., Inc.,* 260 F. Supp. 3d 1202, 1212 (N.D. Cal. 2017) (disregarding interrogatory responses submitted in opposition to summary judgment that the plaintiff "did not sign or verify… when they were served," finding the interrogatory responses were inadmissible); *United States ex rel. Dahlstrom v. Sauk-Suiattle Indian Tribes,* 2019 WL 4082944 (W.D. Wash. Aug. 29, 2019) (noting the requirements of Rule 33 that interrogatories be answered "in writing under oath," and finding an "unsigned and unverified interrogatory response is insufficient to raise a genuine factual dispute meriting trial"); *Cavanagh v. Ford Motor Co*., 2017 WL 2805057, at *7 (E.D.N.Y. June 9, 2017) (holding unverified answers to interrogatories cannot "create a genuine issue of material fact that would allow Plaintiffs to survive summary judgment"); *see also Kincaid v. Anderson*, 681 Fed. App'x 178, 181 (4th Cir. 2017) ("Although interrogatory answers are appropriate materials for summary judgment purposes, … responses here were not properly attested, and the district court did not abuse its discretion in refusing to accept them").  Consequently, because the responses to interrogatories from Ms. Nash-Perry were not verified, the Court finds the evidence is inadmissible and "Exhibit 15" will not be considered in support of Plaintiffs' opposition to summary judgment.

B.      **Expert Report of Richard Bryce- Exhibit 9**

Plaintiffs attached the Rule 26 Report of expert Richard Bryce as "Exhibit 9" to in opposition to the motion.  (Doc. 65 at 152-163.)  Defendants object to this evidence, noting that the "report was not included in any affidavit by Mr. Bryce, but was merely attached to the Declaration of Plaintiffs' counsel, James Bryant."  (Doc. 73-4 at 3.)  Defendants argue, "The Bryce report cannot be considered and should be stricken in that it is unsworn and constitutes hearsay."  (*Id.* at 4.)

Pursuant to Rule 56(c) of the Federal Rules of the Civil Procedure, "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  *See also Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (holding it was an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on inadmissible hearsay rather than the affiant's personal knowledge).  Thus, it is not sufficient for the report of an expert to be attached to the declaration of counsel, who cannot testify about the expert's statements.  *See Harris v. Estendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. Nov. 4, 2011) (striking as hearsay the expert report submitted in opposition to summary judgment because "counsel attached [the] reports to his declaration, but he is not competent testify about the matters therein").

Swearing under penalty of perjury that the expert will testify to the contents of the report is an accepted method for the party to allow a court to consider expert reports for summary judgment.  *Amer. Fed. of Musicians of U.S. and Canada v. Paramount Pictures Corp.*, 903 F.3d 968, 976-77 (9th Cir. 2018).  It is well-established within the Ninth Circuit that unsworn expert reports cannot be used to create a triable issue of fact for purposes of summary judgment.  *See, e.g.*, *Shuffle Master, Inc. v. MP Games LLC*, 553 F.Supp.2d 1202, 1210-11 (D. Nev. 2008) ("an unsworn expert report is inadmissible"); *King Tuna, Inc. v. Anova Food, Inc.*, 2009 WL 650732, *1 (C.D. Cal. Mar. 10, 2009) ("unsworn expert reports are not admissible to support or oppose summary judgment and that to be competent summary judgment evidence, an expert report must be sworn to or otherwise verified, usually by a deposition or affidavit"); *Estate of Nunez v. Cty. of San Diego*, 2018 WL 5817091 (S.D. Cal. Nov. 3, 2018) (declining to consider expert reports that were not signed under penalty of perjury

and were not accompanied by any separate sworn declaration from the experts); *see also Competitive Techs., Inc. v. Fujitsu Ltd.,* 333 F. Supp. 2d 858, 863 (N.D. Cal. 2004) (court has discretion to consider expert reports that are signed but unsworn submitted in opposition to summary judgment).  Here, the expert report of Mr. Bryce is neither signed nor sworn by Mr. Bryce[3]. (*See* Doc. 65 at 163.)  Therefore, the Court finds it is inadmissible at this juncture.[4]

### C.    Statements in the Declaration of Brittney Saucedo

Defendants object to statements contained in Paragraphs 6-7, 9, and 12 of the declaration of Brittney Saucedo, asserting that it is "in many ways, contrary to the testimony she gave in her deposition, lacks foundation, and is misleading based on her deposition testimony."  (Doc. 73-4 at 5, footnote omitted.)

#### 1.    Sham affidavit rule

As Defendants note, "[t]he Sham Affidavit Rule prevents 'a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradiction his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" (Doc. 73-4 at 4, n. 2, citing *Kennedy v. Allied Mut. Ins. Co*., 952 F.2d 262, 266 (9th Cir. 1991).)

The Ninth Circuit explained the rule "should be applied with caution," and applies only in limited circumstances. *School District No.1J v. AC & S Inc*., 5 F.3d 1255, 1264 (9th Cir. 1993); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (explaining the sham affidavit rule has limited application "because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment"). Importantly, the sham affidavit rule applies only to parties, and Ms. Saucedo is not a party in this action.  Instead, Ms. Saucedo appears only as guardian ad litem for Z.S.  Thus, it is not clear that the rule may be applied in this action.

---

[3]Mr. Bryce's report adds very little to the analysis. Plaintiffs refer to this report only for the proposition that the landing outside of the decedent's home was large enough to allow both officers to stand on it. The photos, set forth in Plaintiffs' Exhibit 10, depict the area sufficiently without regard for Mr. Bryce's opinion.

[4] Courts have determined "a party can 'cure' the defect of an unsworn expert's report by proffering the sworn deposition or declaration of the expert." *Liebling v. Novartis Pharms. Corp*., 2014 WL 12576619, at *1 (C.D. Cal. Mar. 24, 2014) (collecting cases); *see also Martinez v. United States*, 2019 WL 266210, n.6 (E.D. Cal. Jan. 18, 2019) (finding the plaintiff cured the procedural deficiency of the original filing by submitting a sworn declaration from the expert and permitting consideration of the expert report).

   2. Paragraphs 6-7

   In these paragraphs of the declaration, Ms. Saucedo reports that "after Chris came back inside our house, he fell asleep by the bed" and "[a]bout 15 minutes thereafter, Chris and I were awakened by loud banging in our door."  (Doc. 68 at 2, ¶¶ 6-7.)  Defendants contend these statements are "contrary to her deposition and lack foundation," because at the deposition Ms. Saucedo testified only that she "was tired" but did not mention sleeping:

> Q. And you said that it made you drowsy.
>
> A. Well, I was tired. I wasn't – 'cause it was 11:30 we stay up that night, and I guess he just wanted to look for an argument with me in that time, and I just wanted to go to sleep because it had been eleven o'clock and we were supposed to be in bed by then so ...

(Doc. 73-4 at 5, quoting Saucedo Depo. 18:3-8)

   The context of this testimony is the amount of alcohol Ms. Saucedo had and its affect upon her, as Ms. Saucedo reported she had "one tall can" between 2 p.m. and 11 p.m., which made her tired. (Saucedo Depo. 17:16-18:4.)  Ms. Saucedo did not testify that she did not fall asleep or make any other statement that directly contradicts the declaration. Instead, the statements can be harmonized to reveal that the alcohol made Ms. Saucedo sleepy during the afternoon and the evening, and the couple later fell asleep.

   Defendants have not explained why they believe Ms. Saucedo's testimony lacks foundation, and the Court declines to speculate as to the basis for the objection, or as to which portions of the paragraphs Defendants seek to strike on these grounds.   Accordingly, Defendants' objections to the statements in Paragraphs 6 and 7 are overruled.

   3. Paragraphs 9 and 17

   Ms. Saucedo stated in her declaration that she "never heard anyone outside of the door announce they were the police and perceived that Chris did not know who was at the door either, let alone the police."  (Doc. 68 at 2, ¶ 9.)  In addition, she reported that she "could perceive that Chris did not know [who was] banging on our door based on him asking who was at the door."  (*Id.* at 3, ¶ 17.) Defendants object to these statements on the grounds that they lack foundation, are speculative, lack personal knowledge, and are misleading.  (Doc. 73-4 at 5-6.)

Defendants observe that during her deposition, Ms. Saucedo testified: "I believe I did have hearing problems that night." (Doc. 73-4 at 5, citing Saucedo Depo. 22:7-25, 23:5-9.) Ms. Saucedo stated she had a habit of stopping listening when in a tense situation, and the night of the incident she stopped hearing what was going on. (*Id.*) For example, Ms. Saucedo stated: "Chris [was] probably talking to me, trying to help me, but I – I don't really recall him saying anything." (*Id.*)

Importantly, Defendants have not identified any specific contradiction between the deposition testimony and the declaration. Instead, Ms. Saucedo's declaration statement that she did not hear anyone announce the police presence is consistent with her reported habit of not hearing things in tense situations. Also, the statement that Ms. Saucedo "perceived that Chris did not know who was at the door either," it is supported by the personal observations of Ms. Saucedo who also reported she "heard Chris continuously ask, who was at our door, or words to that effect." (Doc. 68 at 2, ¶ 10.) Defendants' objections to the statements in Paragraph 9 are overruled.

### 4. Paragraph 12

In the declaration, Ms. Saucedo reports that she "looked out of the peephole and did not see anyone outside of [the] door." (Doc. 68 at 3, ¶ 12.) Defendants object to this statement on the grounds that it "lacks foundation, is misleading, and is irrelevant." (Doc. 73-4 at 6.)

Again, Defendants fail to explain the objection that the statement "lacks foundation," as it is clear Ms. Saucedo may testify as to her own actions and perceptions. The statement does not contradict her deposition testimony in which she reported that she looked through the peephole before there was any banging on the door, but not after. (*See* Saucedo Depo. 25:17-22.) Defendants' objections Paragraph 12 are overruled.

### D. Autopsy Photos- Exhibit 12

Defendants object to the autopsy photos identified as "Exhibit 12" to the declaration of James Bryant, asserting Plaintiffs "submitted no expert opinion which explains the significance of these photos in the context of this lawsuit." (Doc. 73-4 at 6, citing *Dudley v. Bexar Cty.*, 2014 U.S. Dist. LEXIS 169913 (W.D. TX Dec. 9, 2014) [finding photographs depicting bullet holes and shell casings to be of "limited probative value" because the plaintiff did not present any expert testimony interpreting the photographs].)

Notably, in support of the opposition to summary judgment, Plaintiffs requested permission to file the autopsy photos as "Exhibit 12" under seal.  (Doc. 69.)  The Court granted the motion and ordered the documents to be submitted to the Court within three court days.  (Doc. 70 at 3.)  However, it appears Plaintiffs have elected to not rely upon this evidence, because they did not submit the photos for docketing.  Because the documents have not been submitted in evidence, Defendants' objections thereto are moot.

### E.    Evidence Considered by the Court

When evaluating a motion for summary judgment, the court "cannot rely on irrelevant facts, and thus relevance objections are redundant."  *Burch v. Regents of the Univ. of Cal.,* 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).  Likewise, "improper legal conclusions ... are not facts and likewise will not be considered on a motion for summary judgment."  *Id.*  Accordingly, the Court has relied only upon any evidence it deems admissible in evaluating the merits of the motion for summary judgment now before the Court.

## IV.    Discussion and Analysis

Defendants seek summary judgment of all remaining claims in the action and assert that "Defendants are entitled to judgment as a matter of law as to all claims alleged."  (Doc. 61-1 at 16-33.) Plaintiffs contend genuine issues of material fact preclude summary adjudication of their claims because "[w]hen the facts in this case are viewed in the light most favorable to Plaintiffs, they show that the officers used excessive force against [the decedent] when they shot him."  (*See* Doc. 64 at 20.)

### A.    Standing of Plaintiffs

As an initial matter, Defendants assert that "neither Ms. Nash-Perry or Mr. Okamoto have standing to bring any claim[] other than the Fourteenth Amendment Claim, because of Z.S.'s status as Christopher's non-biological child and because neither were financially dependent on him."  (Doc. 61-1 at 16.)  On the other hand, Plaintiffs assert Ms. Nash-Perry and Mr. Okamoto have standing to assert claims related to the wrongful death of their son under California law.  (Doc. 64 at 13-14.)  In addition, the parties disagree regarding whether Z.S. has standing to bring a claim under the Fourteenth Amendment.  (Docs. 77, 78.)

///

14

1              1.      Judicial admission

2        Defendants argued for the first time at the hearing and in the supplemental briefing that

3  Plaintiffs' complaints contain admissions related to the relationship between the decedent and Z.S.

4  (Doc. 77 at 2.)  Defendants note that "Jason Okamoto and Z.S.'s Complaint clearly articulates that

5  Christopher Okamoto 'held Z.S. out to the community as his daughter.'"  (*Id.*, quoting Case No. 1:19-

6  cv-1125-LJO-JLT, Doc. 1 at 3, ¶ 2.)  Defendants contend "this statement was a judicial admission."

7  (*Id.*)

8        The Ninth Circuit explained that "judicial admissions" include "formal admissions in the

9  pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need

10  for proof of the fact." *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). In

11  general, "a statement in a complaint may serve as a judicial admission."  *Sicor Ltd. v. Cetus Corp.*, 51

12  F.3d 848, 859-60 (9th Cir. 1995). Under federal law, judicial admissions "are generally binding on the

13  parties and the Court."  *Lacelaw Corp.*, 861 F.2d at 226 (citation omitted).  However, whether "to treat

14  a statement as a binding judicial admission" is committed to the discretion of the Court.  *Id.* at 227

15  (reviewing the findings of the district court to determine whether there was an abuse of the court's

16  discretion); *see also Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997) ("A

17  trial judge has discretion whether to accept a judicial admission").

18        In the complaint filed by previous counsel, Plaintiffs also asserted Z.S. was "dependent upon

19  Decedent for at least one-half of her support, and … resided with Decedent for at least one hundred-

20  eighty days prior to Decedent's passing."  (Case No. 1:19-cv-1125-LJO-JLT, Doc. 1 at 3, ¶ 2.)

21  Following the filing of the complaints, the parties learned facts through discovery that contradicted the

22  allegations, including that Z.S. did not live with the decedent for 180 days.  (*See* Doc. 64 at 13.)  In

23  addition, despite the allegations presented in the complaint, Defendants questioned both Ms. Nash-

24  Perry and Mr. Okamoto during their depositions about the relationship of the decedent and Z.S. and his

25  financial support for the child.  (*See* Doc. 64-1 at 9-12, 20-22.)  Given the contrary evidence presented,

26  the Court finds the allegations related to Z.S. did not "dispens[e] wholly with the need of proof for the

27  fact," and the defense did not rely upon these allegations.  Thus, the Court declines to exercise its

28  discretion to find the statements in the Okamoto complaint were a "judicial admission."  *See, e.g.*,

*Singer*, 116 F.3d at 376-77 (supporting the district judge's discretion to find a judicial admission "[i]n the absence of any conflicting evidence"); *Parker v. Arizona*, 2019 WL 2136290 at *3 (D. Az. May 13, 2019) (declining to characterize statements of anticipated facts made "during the early stages of the case" as judicial admissions).

### 2.   Survival claims

"In a survival action, a decedent's estate may recover damages on behalf of the decedent for injuries that the decedent has sustained." *Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426, 429 (9th Cir. 1994). Survivors of an individual may bring claims arising under 42 U.S.C. § 1983 "if the relevant state's law authorizes a survival action." *Hayes v. County of San Diego*, 736 F.3d 1223, 1228 (9th Cir. 2013) (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998)). Here, the parents seek to state Section 1983 claims for violations of civil rights on behalf of their deceased son.

To determine whether a plaintiff may bring a survivor action, the Ninth Circuit instructs that the Court rely upon California Code of Civil Procedure Section 377.30, rather than Section 377.60. *Hayes*, 736 F.3d at 1129. In relevant part, Section 377.30 provides that "[a] cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest...and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." Cal. Code Civ. P. § 377.30. Thus, a Section 1983 survival claim may be prosecuted by a successor in interest "[w]here there is no personal representative for the estate." *Tatum v. City & County of S.F.*, 441 F.3d 1090, 1093 n.2 (9th Cir. 2006).

California Code of Civil Procedure § 377.11 defines a successor in interest as (1) "the beneficiary of decedent's estate" or (2) any "other successor in interest who succeeds to a cause of action…." In the context of an intestate decedent, the "beneficiary of the decedent's estate" is "a person who succeeds to claims or property under Probate Code sections 6401 and 6402." Cal. Code Civ. Proc. § 377.10(b). Further, under California Probate Code 6402(a), if an individual dies intestate without a surviving spouse, the decedent's estate passes to "the issue of the decedent." *Id.* In the event the decedent has no surviving issue, the estate passes "to the decedent's parent or parents equally." *Id.*, § 6402(b).

It is undisputed that the decedent did not have biological children. The defense asserts that the decedent was the presumed father of Z.S.  However, the evidence upon which they rely is mixed.  Ms. Nash-Perry asserts that the decedent began providing for the child after she told him that if he felt the baby was his, he should "do the right thing, and that is what he did."  (Doc. 61-4 at 9-10.)  She explained that "from the day he knew that Brittney was pregnant to the date he passed away, his understanding he was the father." (*Id.*)  Mr. Okamoto testified that the decedent was taking care of the child and his girlfriend despite having expressed doubts about whether the child was his.  (Doc. 61-4 at 22.) This is not the unequivocal, open, and public expression of parenthood that Family Code section 7611(d) contemplates. *See In re Spencer W.* 48 Cal.App.4th 1647, 1653-1654 (Cal.App. 4 Dist.,1996).

On the other hand, without the paternity presumption, it is undisputed that as the non-biological child of the decedent, Z.S. is not a successor in interest. Plaintiffs acknowledge that Z.S. lived with the decedent for only approximately two months, and she does not satisfy the requirement that "minor reside[] for the previous 180 days in the decedent's household and [be] dependent on the decedent for one-half or more of the minor's support."  (Doc. 65 at 13, noting requirements under Section 3774.60.)  Thus, Plaintiffs concede Z.S. "is not eligible as an heir."  (*Id.*)  The Court finds that, as the surviving parents of the decedent, Plaintiffs Jason Okamoto and Tametria Nash-Perry have standing to act as the decedent's successors in interest.

### 3.    Wrongful death claims

Defendants also argue that "Ms. Nash Perry and Mr. Okamoto cannot bring a wrongful death claim because they lack standing under California Code of Civil Procedure Section 377.60."  (Doc. 61-1 at 16.)  Plaintiffs respond that "Jason Okamoto and Tametria Nash-Perry are the only heirs eligible to bring a claim for wrongful death against Defendants" under California law.  (Doc. 64 at 14, emphasis omitted.)

In general, "[i]n a wrongful death action, the decedent's dependents ... pursue claims for personal injuries they have suffered as a result of a wrongful death." *Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426, 429 (9th Cir. 1994).  Standing to bring a wrongful death claim is governed by California Code of Civil Procedure § 377.60, and "[t]he category of persons eligible to bring wrongful death actions are strictly construed." *Phraner v. Cote Mart, Inc.*, 55 Cal.App.4th 166, 168 (1997); *see*

*also Medrano v. Kern Cty. Sheriff's Officer,* 921 F. Supp. 2d 1009, 1018 (E.D. Cal. 2013) ("Standing to sue is governed by California Code of Civil Procedure § 377.60, and the categories of persons eligible to bring wrongful death actions are strictly construed.").  In relevant part, Section 377.60 provides:

> A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:
>
> (a) The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession. If the parents of the decedent would be entitled to bring an action under this subdivision, and the parents are deceased, then the legal guardians of the decedent, if any, may bring an action under this subdivision as if they were the decedent's parents.
>
> (b) (1) Whether or not qualified under subdivision (a), if they were dependent on the decedent, the putative spouse, children of the putative spouse, stepchildren, parents, or the legal guardians of the decedent if the parents are deceased.
>
> (2) As used in this subdivision, "putative spouse" means the surviving spouse of a void or voidable marriage who is found by the court to have believed in good faith that the marriage to the decedent was valid.
>
> (c) A minor, whether or not qualified under subdivision (a) or (b), if, at the time of the decedent's death, the minor resided for the previous 180 days in the decedent's household and was dependent on the decedent for one-half or more of the minor's support.

Cal. Civ. Code § 377.60.

A decedent's parents become heirs under the wrongful death statute when there is no surviving issue. *See* Cal. Prob. Code, § 6402(b); *Chavez v. Carpenter*, 91 Cal.App.4th 1433, 1440 (2001). However, "[r]egardless of their status as heirs, parents may sue for the wrongful death of their child if they were dependent on the decedent." *Chavez*, 91 Cal.App.4th at 1440 (quoting Code Civ. Pro. § 377.60(b)); *see also Foster v. City of Fresno*, 392 F.Supp.2d 1140, 1146 (E.D. Cal. 2005). Accordingly, "a parent may only assert a wrongful death claim if there are no children or issue *or* if ... she is dependent on the decedent." *Foster*, 392 F. Supp.2d at 1146 (emphasis added).

Again, it is undisputed that Z.S. is not the child or issue of the decedent, and "Z.S. does not meet the standing requirements pursuant to section 377.60(c) in order to bring a claim for wrongful death." (Doc. 64 at 14.)  Thus, Ms. Nash-Perry and Mr. Okamoto have standing to act as the heirs of

the decedent, whether they were dependent upon the decedent.  *See Foster*, 392 F. Supp.2d at 1146.

Consequently, at the hearing, counsel for Z.S. agreed that her claims, except for the Fourteenth

Amendment claim, should be adjudicated against her.

4.        Standing of Z.S. under the Fourteenth Amendment[5]

There is a constitutionally protected liberty interest in the companionship and society of a parent

and child. *Ward v. City of San Jose*, 967 F.2d 280, 283 (9th Cir. 1992); *Lemire v. Cal. Dep't. of*

*Corrections & Rehabilitation*, 726 F.3d 1062, 1075 (9th Cir. 2013). Thus, parents and children of an

individual killed by law enforcement offers may bring a claim for a violation of the Fourteenth

Amendment. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998).

Defendants contend, "Z.S. has no standing to make a Fourteenth Amendment claim."  (Doc. 77

at 2.)  Defendants observe that "[h]istorically, the Supreme Court's family and parental- rights holdings

have involved *biological* families."  (*Id.* at 3, citing *Smith v. Organization of Foster Families for*

*Equality and Reform (OFFER)*, 431 U.S. 816, 842-43 (1977), emphasis in original.)  For example,

Defendants note the Fifth Circuit and Seventh Circuit courts "refused to accord foster parents a

constitutionally protected liberty interest in the foster family relationship where the foster care

agreement involved only temporary care of a child during a transitional period in the child's life."  (*Id.*,

citing *Kyees v. County Dep't of Public Welfare*, 600 F.2d 693, 698-99 (7th Cir. 1979); *Drummond v.*

*Fulton County Dep't of Family & Children's Servs*., 563 F.2d 1200, 1206, 1208 (5th Cir. 1977), *cert.*

*denied*, 437 U.S. 910 (1978).)  Further, Defendants observe that the Ninth Circuit determined

noncustodial godparents did not have protected liberty interests in visiting their grandchildren, and

foster parents similarly lacked cognizable liberty interests. (*Id.*, citing *Miller v. California*, 355 F.3d

1172 (9th Cir. 2004); *Backlund v. Barnhart*, 778 F.2d 1386 (9th Cir. 1985).)

Defendants acknowledge that "[c]ourts applying *OFFER* have reached varying conclusions

regarding whether parents have a protected familial relationship with their non-biological children,"

and a liberty interest was recognized by the Second Circuit and Tenth Circuit courts where there was

---

[5] Although Defendants challenged the standing of the decedent's parents, the parties did not address Z.S.'s standing to raise a Fourteenth Amendment claim in the motion to summary judgment or the opposition.  Therefore, the parties provided supplemental briefing related to the child's standing following the hearing on the motion.  (Docs. 77, 78.)

"significant evidence of a sustained long term relationship."  (Doc. 77 at 3-4, citing, e.g., *Rivera v. Marcus*, 696 F.2d 1016, 1024 (2d Cir. 1982); *Elwell v. Byers*, 699 F.3d 1208, 1211 (10th Cir. 2012).)  However, Defendants maintain there is no evidence of a relationship like those considered by the courts in *Rivera* and *Elwell*.  (*Id.* at 4.)

Plaintiffs maintain "Z.S. has standing to sue under the Fourteenth Amendment in her individual capacity."  (Doc. 78 at 2, emphasis omitted.)  Plaintiffs observe that the Ninth Circuit held: "Judicially enforceable Fourteenth Amendment interests require enduring relationships reflecting an assumption of parental responsibility and "stem from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children."  (*Id.* at 4, quoting *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1058 (9th Cir. 2018).)  Plaintiffs contend, "Decedent treated Z.S. as his own even though he doubted whether she was his natural child."  (*Id.* at 5.)  In addition, Plaintiffs observe:

> Z.S. resided with Decedent, Christopher Okamoto for a period of 60 to 90 days. During that brief time, Decedent treated Z.S. as his child by caring and providing for her. Decedent assumed responsibility for Z.S.'s upbringings up until his death. Decedent also maintained consistent contact with Z.S. for the brief period that he was in her life once Z.S and her mother moved in with Decedent two months prior to his death.

(*Id.* at 78.)  Plaintiffs argue that "Z.S. was deprived of the love, companionship, comfort, support, and care, of the decedent and will continue to be so deprived for the remainder of her natural life," and indicate Z.S. had a protected liberty interest in the relationship on these grounds.  (*Id.* at 4-5.)

Significantly, in *OFFER*, the Supreme Court observed that "biological relationships are not exclusive determination of the existence of family."  *Id.*, 431 U.S. at 843.  The Court explained: "No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship."  *Id.* at 844.  In determining whether an individual has a protected liberty interest in a familial relationship, courts have considered whether there is a blood relationship; whether the relationship arises under the law, such as a foster parent or stepparent; the length of the relationship; and whether the natural parent opposes the relationship or relinquished rights.  *See e.g.*, *OFFER*, 431 U.S. at 844-847 (noting "important distinctions between the foster family and the natural family," include the contract with the state and

the right of the state to interfere in the relationship); *Miller*, 355 F.3d at 1175-76 (considering the court had never extended the protected liberty interest to grandparents; the grandchildren were "wards of the court at all relevant times;" and the interests of the grandparents conflicted with those of the biological mother, who opposed visitation with the grandparents); *Elwell*, 699 F.3d at 1211, 1216-17 (finding a liberty interest where the parental rights of the biological parents were terminated, and the foster parents had cared for the child "nearly his entire life [more than a year] and were on the verge of adopting him").

For example, based upon the nature and length of the relationship, the one court found a protected liberty interest where the plaintiff was "neither Decedent's biological nor adopted mother." *See Ramirez v. City of Oxnard*, 2013 WL 12129396 at *7 (C.D. Cal. July 23, 2013). The defendants argued Ramirez lacked standing to bring claims under the Fourth and Fourteenth Amendments, and the plaintiff conceded she was unable to bring a Fourth Amendment claim. *Id.*, at *5. However, Ramirez maintained she had "standing to assert a Fourteenth Amendment claim for state-imposed interference with her familial relationship with Decedent." *Id.* The court agreed, noting:

> It is undisputed that she married Decedent's biological father and raised Decedent as her son since he was four and a half years old until his death when he was eighteen. During that time, Eileen, Jose Ramirez, and Decedent lived together as a family of three. Further, Decedent's biological mother passed away when he was approximately five years old. Prior to her passing, Decedent had been taken away from her by social services due to her alcoholism and sole custody to Decedent was granted to his father, Jose. Thus, Decedent had little relationship with his biological mother. Moreover, Defendants do not dispute that Eileen had a mother-son relationship with Decedent. She monitored his education, tended to his health, cooked for him at home, bought him clothes, provided financial support, and took him on vacations. Conversely, it is undisputed that Decedent treated Eileen like his mother, assisting her when she was ill, giving her gifts, and confiding in her about personal matters. Finally, as a result of Decedent's passing, Eileen has sought medical help and therapy for depression and anxiety, and is currently on medication for her depression.

*Id.* at *7 (citations to the record omitted). In addition, the court observed that Ramirez's relationship with her stepson was "not … a creature of law, but rather out of her marriage to Decedent's biological relationship," and she had no expectation of the relationship being "attenuate by any state laws or related contracts. *Id.* Further, the court observed that "'just as the "natural bonds of affection [will] lead [biological] parents to promote their child's well-being,' … it stands to reason that a person married to a child's biological parent is more likely to draw from these 'natural bonds of affection'

when compared to state-created foster parent." *Id.*, quoting *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2582 (2013). Therefore, the Court concluded "Ramirez has standing to assert [a] Fourteenth Amendment claim." *Id.* at *7.

The facts before the Court are distinguishable from *Ramirez*. The decedent was not married to the mother of Z.S., and there are no facts suggesting he planned to adopt Z.S. *Compare with Elwell*, 699 F.3d at 1211, 1216-17 (protected family interest where the foster parents had taken steps towards adoption); *Ramirez*, 2013 WL 12129396 at *7 (finding a protected interest where the plaintiff was married to the father of the decedent and raised him for nearly 14 years). Z.S. lived with the decedent for only two months. Such a short duration weighs against a finding of a liberty interest. *See Backlund*, 778 F.2d at 1389-90 (finding foster parents who cared for a child for about three years lacked a cognizable liberty interest). Moreover, Plaintiffs do not present evidence that the decedent provided parental care for Z.S., such as attending medical appointments, feeding her, changing her diapers, bathing her, playing with her, or providing any other care for her. Absent such evidence, the fact that Z.S. and her mother resided with the decedent does not alone establish that they lived as a *family* unit, or that the decedent and the child enjoyed an enduring parent-child relationship. Because the plaintiffs have failed to present evidence Z.S. had a protected interest in a relationship with the decedent, the Court concludes Z.S. lacks standing to bring a claim under the Fourteenth Amendment.

## B.   Claims arising under Section 1983

Plaintiffs seek to hold Defendants liable for civil rights arising under the Fourth and Fourteenth Amendments to the Constitution of the United States, pursuant to 42 U.S.C. § 1983. (*See* Doc. 38 at 10-28; Case No. 1:19-cv-1125-LJO-JLT, Doc. 1.) Section 1983 "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law.

22

*West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must establish a specific injury was suffered and show a causal relationship between the defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). In other words, "[s]ome culpable action or in action must be attributable to defendants." *See Puckett v. Corcoran Prison - CDCR*, 2012 WL 1292573, at *2 (E.D. Cal. Apr. 13, 2012).

### 1.   Use of force under the Fourth and Fourteenth Amendments

The Supreme Court of the United States determined that the Due Process Clause of the Fourteenth Amendment protects individuals who have not yet been convicted of a crime "from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 388 (1989). However, allegations of excessive force are analyzed under the Fourth Amendment. *Id.* ("claim[s] that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard"). Accordingly, "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

"An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *County of Los Angeles, Calif. v. Mendez*, 137 S.Ct. 1539, 1547 (2017). An officer's use of force violates the Fourth Amendment is determined by "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Thus, the Court must balance the force used against the need for the use of force. *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)

In applying this standard, the factfinder considers "the totality of the circumstances and . . .

whatever specific factors may be appropriate in a particular case." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  Courts consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee*, 471 U.S. at 8-9). In general, the "most important" under *Graham* factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). Courts must also consider "the quantum of force used" "because the 'factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).  Ultimately, the "reasonableness" of an officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  Due to the fact-intensive nature of the *Graham* test, the Ninth Circuit observed that "summary judgment . . . in excessive force cases should be granted sparingly. This is because police misconduct cases almost always turn on a jury's credibility determinations." *Espinosa v. City and County of San Francisco*, 598 F. 3d 528, 544 (9th Cir. 2010) (quoting *Santos v. Gates*, 287 F. 3d 846, 853 (9th Cir. 2002)).

Defendants argue "[t]here is no question that the use of deadly force by Officer Patino was objectively reasonable."  (Doc. 61-1 at 23.)  Defendants observe that the officers were "dispatched to the apartment complex for a call to service related to a domestic violence incident" and "[d]omestic violence situations are 'particularly dangerous' because 'more officers are killed or injured on domestic violence calls than on any other type of call."  (*Id.*; n. 5 quoting *George v. Morris*, 736 F. 3d 829, 839 (9th Cir. 2013).)  Defendants maintain that Patino and Celedon[6] "hear[d] people arguing inside the

---

[6]What the officers heard is inconsistent. Officer Celedon testified that he heard nothing from the apartment as he and Officer Patino walked up the stairs toward the apartment. (Doc. 61-4 at 76 -78.) After Officer Patino arrived on the landing, Officer Celedon heard a voice, but he could not tell if it was male or female and he could not make out what was being said. *Id.* He thought it was louder than what would be used in normal conversation. *Id.* He also heard a "loud shuffling" sound, which could have been furniture moving. *Id.* at p. 81. These sounds lasted "a few seconds." *Id.* at 82-83. Officer Celedon didn't know if what the voice was saying was in response to Officer Patino's announcement of their presence. (Doc. 61-4 at 85) Officer Patino testified he heard a male *and* a female voice. (Doc. 61-4 at 107) He testified that the female's voice was "elevated," and the man was "screaming" at the female. *Id.*

apartment and both heard what they perceived to be a struggle inside the apartment." (*Id.* at 24.) Further, Defendants assert that the decedent opened the door standing in a one-handed shooter position, with his arm fully extended holding what appeared to be a firearm "pointed directly at Officer Patino's head," and "Patino believed that the gun was real and capable of killing him." (*Id.*)  According to Defendants, "The reasonable belief that the gun was real, coupled with [the decedent's] actions of pointing the gun at Officer Patino," establishes that the decedent "posed a deadly threat not only to Officer Patino, but to whoever was inside the apartment." (*Id.*)

Defendants contend "it is well established that when a potential assailant threatens a police officer with a weapon, the officer is justified in using deadly force." (*Id.* at 21, citing, *e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005); *Estate of Larsen v. Murr*, 511 F. 3d 1255, 1260 (10th Cir. 2008) ["a reasonable officer need not await the glint of steel before taking self-protective action"]; *Garcia v. United States*, 826 F. 2d 806, 807, 812 (9th Cir. 1987) [a "felonious and deadly assault" gave the officer probable cause to believe that victim posed a "threat of serious physical harm]; *Lal v. California*, 746 F. 3d 1112, 1114 (9th Cir. 2014).)  Defendants note the Ninth Circuit determined "deadly force is 'unquestionably reasonable' if a suspect 'reaches for' what is believed to be a weapon or makes some 'similar threatening gesture,' like getting into a 'shooter's stance.' (*Id.* at 22, quoting *Cruz v. City of Anaheim*, 765 F. 3d 1076, 1079 (9th Cir. 2014), emphasis omitted.) Defendants conclude that based on the "facts and circumstances" in this action, "Patino had every right to use deadly force to protect himself." (Doc. 61-1 at 24.)

On the other hand, Plaintiffs argue summary adjudication of this claim is not appropriate due to "a question of fact as … to whether or not [the decedent] was pointing a gun at either the first or the second volley of gunshots." (Doc. 64 at 24.)  Plaintiffs observe, "The Ninth Circuit has consistently held that while the presence of a weapon is an 'important consideration' in determining whether a use of deadly force is objectively reasonable, it is not dispositive." (*Id.* at 21, quoting *Glenn v. Washington County*, 673 F.3d 864, 872-73 (2011).)  Defendants contend the Ninth Circuit has determined "[i]f a suspect is armed with a weapon but is not threatening the officers or others with it, the Fourth Amendment does not permit the officers to use deadly force against the suspect." (*Id.*, citing, *e.g.*, *George*, 724 F.3d at 1199-1200; *Glenn*, 673 F.3d at 879-80; *Harris v. Roderick*, 126 F.3d 1189, 1202-

03 (1997); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).)

Plaintiffs observe that courts have considered physical evidence—and whether such corroborated officers' versions of events— in evaluating whether the force used was reasonable.  (Doc. 64 at 23-24, citing, *e.g., Aguilar v. County of Fresno*, 2010 U.S. Dist. LEXIS 30933, 2010 WL 1267355 (E.D. Cal. Mar. 31, 2010); *Reed v. City of Modesto*, 122 F. Supp. 3d 967 (E.D. Cal. 2015).)  For example, in *Aguilar*, the court determined summary judgment was not appropriate where the physical evidence included the positioning of the decedent's body and the location where his knife was found.  *Id.*, 2010 WL 1267355 at *4.  The Court explained the "physical evidence [was] susceptible to at least two interpretations," one of which "can be interpreted to support a factual narrative that contradicts the narrative asserted by Defendants.  *Id.*  Because the Court must take the interpretation of the physical evidence in favor of the non-moving party, the Court found the deputy was neither entitled to summary adjudication for a claim of excessive force nor qualified immunity.  *Id.*, 2010 WL 1267355 at *4-5.

In *Reed*, the Court considered the physical evidence in evaluating the defendants' motion for judgment as a matter of law, after a jury returned a verdict in favor of the plaintiff.  *Id.*, 122 F. Supp. 3d at 971-72.  The defendants asserted the officer's use of force was reasonable and he was entitled to qualified immunity.  *Id.*  The Court noted there was some dispute about the distance between the plaintiff and the defendant officer, and the physical evidence did "not corroborate[]" the officer's statements concerning when he fired a second volley of shots at Reed. *Id.* at 978.  The Court observed that "[t]he bullet that did the most damage hit [Reed] in his side and not his front," and "[f]rom this evidence, the jury could have reasonably concluded that Plaintiff was turning away and not confronting the Police Officers during the second volley of shots." *Id.*  Thus, the Court concluded the officer was not entitled to judgment as a matter of law.  *Id.* at 981-982.

Similarly, Plaintiffs argue the physical evidence before the Court does not support the version of events presented by Patino and Celedon and can reasonably be interpreted in a manner that contradicts their claims.  Plaintiffs contend "analysis of the gunshot wounds that [the decedent] sustained demonstrates that [the decedent] could not have been facing Officer Patino in a "one-handed shooting stance" and pointing an object at Officer Patino during the entirety of the time that Officer Patino was firing his weapon."  (Doc. 64 at 21.)  Plaintiffs assert:

> The locations and trajectories of those wounds, including two gunshot wounds to the outer left chest that traveled front to back and left to right (east to west direction), are consistent with a movement in which [the decedent] was rotating away from Patino in a westerly direction in an attempt to retreat while trying to close the front door with his left arm, exposing his entire left side of his body to Officer Patino's gunfire.  A jury could find from this physical evidence that [the decedent] did not pose an immediate threat of death or serious bodily injury to Officer Patino at the time of either the first or second volley of shots fired in [the decedent] direction.

(*Id.*)  Plaintiffs maintain that "[b]ased upon the upon the physical evidence, we know that it would have been virtually impossible to achieve the gunshot wound positioning and trajectories if you relied on Officer Patino's statements."  (*Id.* at 24.)

The Ninth Circuit observed that when cases challenging the use of force involve a death, the evidence should be carefully examined "to determine whether the officer's story is internally consistent and consistent with other known facts."  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 1994); *see also Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (explaining that "we must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts").  In *Scott v. Henrich*[7], 39 F.3d 912, 915 (9th Cir 1994), the Court held,

> Deadly force cases pose a particularly difficult problem under this regime because the officer defendant is often the only surviving eyewitness. Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. The judge must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts. *Hopkins*, 958 F.2d at 885–88; *Ting v. United States*, 927 F.2d 1504, 1510–11 (9th Cir.1991). In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

Here, there are many facts in dispute related to the events that occurred prior to the shooting.  Although the officers report they heard people arguing inside the apartment and sounds of a struggle when they

---

[7] The Court notes that in *Scott*, the Ninth Circuit Court of Appeals determined that the officers acted constitutionally when they shot and killed a person who pointed a gun at them. *Scott* at 914. However, the salient details of the officers' statements in *Scott* were not contradicted by witnesses, unlike here where witnesses contradict important facts including that there were no sounds of a struggle in the apartment when Officer Patino was at the door and that he did not announce himself as a police officer after the decedent expressed a lack of awareness of who was at the door in addition to the physical injuries suffered by the decedent, which appear facially inconsistent with the account of Officer Patino.

1  arrived, Ms. Saucedo reports they were asleep and the neighbors— who had been able to hear the

2  arguing throughout the day and night—testified it was quiet and there was no movement in Apartment

3  No. 46 when the officers arrived.  (*See* Doc. 65 at 134, 135, 140.)

4       In addition, at the time of the shooting, Officer Celedon stood near the top step of the stairway

5  about "five to ten feet" away from, but in a "V" formation with, Officer Patino. P. 21 Though Officer

6  Patino testified the decedent opened the door with his gun arm fully extended, Officer Celedon did not

7  see this. (Doc. 61-4 at 86-87)  He testified, "From my position, I couldn't -- from my position, all I

8  could see was Senior Officer Patino. What I heard was what I believed to be the door opening. It was at

9  that point that I saw Senior Officer Patino shine his light towards the doorway and then I immediately

10  saw him yell "gun" and draw his firearm." Id. Though Officer Celedon clarified that he could not see

11  into the doorway, the re-enactment photos demonstrate that even without seeing into the doorway, the

12  decedent's extended gun arm should have been visible. (Doc. 75 at 6).

13       In addition, though the officers assert Patino repeatedly announced the presence of the

14  Bakersfield Police Department, Ms. Saucedo reports that she and the decedent did not know who was at

15  the door, and he "continuously" asked who was at the door.  Further, both Mr. White and Officer Patino

16  report they heard a male voice from inside the apartment yelling questions such as: "Who the fuck is at

17  my door?" "Who's banging on my door?" and "Who is that knocking on my damn door?" (Doc. 61-4 at

18  110-11, Patino Depo. 61:23-62:10; Doc. 65 at 127-28, White Depo. 25:24-26:1, 26:14-22.)  This raises

19  an inference that Patino should have known that the decedent did not realize that police officers were at

20  his door.

21       This isn't a situation in which Patino had no time to yell out that the police were present. He

22  testified, "At that point I see the door handle begin to turn very slowly. . . The door -- I looked at

23  Officer Celedon. Something didn't seem right to me. This is not the typical response that we get from

24  when we're investigating any type of offenses like this or somebody opening the door. It's just very,

25  very slow." (Doc. 65 at 25:6-11.)  The officer then testified he saw the gun through the narrow opening

26  of the door (*id.* at 27:2-10) and it was pointed directly at him. (Doc. 65 at 25:6-11.)

27       This evidence taken in the light most favorable to Plaintiffs would indicate that there was no

28  crime in progress, and the decedent was awakened by the banging on the door and remained unaware of

who was outside of his apartment door, although he asked repeatedly.  Because they lived in a high crime area, a factfinder could infer that the decedent approached the door with a weapon drawn out of caution, while his girlfriend hid in fear in the bathroom with the baby. Indeed, Mr. White testified that immediately after the decedent yelled words to the effect of, "Who is at the door?" the door opened, the shots were fired. This is contrary to Officer Patino's testimony that he identified himself after the decedent yelled words expressing unawareness of who was at the door. *See, e.g. Cooper v. Sheehan*, 735 F.3d 153, 159-60 (4th Cir. 2013) (in holding that officers' use of deadly force was not reasonable, the court noted "[i]mportantly, the Officers never identified themselves—even when asked" and there was an explanation that a person might carry a firearm while investigating a disturbance on his property).

The evidence before the Court creates a dispute related to the positioning of the decedent.  For example, Patino reported that the decedent stood in "a one-handed shooter position," and only changed positions to take a step back between the first volley of six shots and the second volley of two more shots.  In the re-enactment photos with Patino, it appears as though the person standing in place of the decedent had primarily the right side of his body exposed; his left shoulder, most of his trapezius and his left arm were behind the door. (*See* Doc. 74 at 6, 9.)  The decedent did not sustain any injuries to the right side of his body, and two bullets traveled "in a front to back, left to right… trajectory."  (*See* PSF; Doc. 65 at 177 ¶ D.)  As Plaintiffs contend, the physical evidence could be interpreted such that the decedent was not standing in the position identified by Patino and he could have exposed his left side only when turning away from the officer.  (*See* Doc. 65 at 9.)  Under such circumstances, the Court must take the evidence in favor of Plaintiffs' interpretation.  *See Aguilar*, 2010 WL 1267355 at *4-5.

Finally, the Court notes that "[u]nder Ninth Circuit precedent, the mere presence of a weapon does not justify the use of deadly force."  *Haugen v. Brosseau,* 351 F.3d 372, 383 (9th Cir. 2003) (citations omitted); *see also Harris*, 126 F.3d at 1204 ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed"); *Curnow,* 952 F.2d at 323, 325 (according to the plaintiff's version of the facts, the decedent had a gun but was not pointing it at the officers or facing them when shot).  Indeed, even with a weapon present, "[a] simple statement by an officer that he fears for his safety or the safety of others is not

1  enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d

2  1272, 1281 (9th Cir. 2001).  Given the material differences in the facts presented by Plaintiffs and

3  Defendants, and inferences that may be made from the physical evidence, the Court is unable to find

4  that objective factors justified the actions of Patino.  Defendants have failed to show the absence of a

5  dispute of material fact, and the Court finds summary adjudication of the claims for excessive force is

6  not appropriate.  *See Aguilar*, 2010 WL 1267355 at *4-5.

7                          2.       Due process and familial rights under the Fourteenth Amendment

8          The Supreme Court explained: "[T]he freedom to enter into and carry on certain intimate or

9  private relationships is a fundamental element of liberty protected by the Bill of Rights." *Board of*

10  *Directors of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544 (1987).  Consequently, the Ninth Circuit

11  has recognized there is a constitutionally protected liberty interest in the companionship and society of

12  a parent and child. *Ward*, 967 F.2d at 283; *Lemire*, 726 F.3d at 1075; *see also Venerable v. City of*

13  *Sacramento*, 185 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002).  Thus, "[a] substantive due process claim

14  may be asserted by … the parents and children of a person killed by law enforcement officers."

15  *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998).

16          To establish a claim for interference with familial rights under Section 1983, a plaintiff must

17  show "the defendant acted with deliberate indifference to these rights." *Venerable*, 185 F. Supp. 2d at

18  1131; *see also Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998) ("to prove their Fourteenth

19  Amendment claim, [plaintiffs] had to prove that the Officers acted with deliberate indifference to [their]

20  rights of familial relationship"). This may be established where the officer's conduct "shock[ed] the

21  conscience."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1989); *see also Porter v. Osborn*, 546

22  F.3d 1131, 1137 (9th Cir. 2008). The Ninth Circuit explained a court must first inquire "whether the

23  circumstances are such that actual deliberation [by the officer] is practical." *Id.* The Court explained:

24        Where actual deliberation is practical, then an officer's "deliberate indifference" may
      suffice to shock the conscience. On the other hand, where a law enforcement officer

25        makes a snap judgment because of an escalating situation, his conduct may only be
      found to shock the conscience if he acts with a purpose to harm unrelated to legitimate

26        law enforcement objectives.

27  *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).  Where an officer's actions come in rapid

28  succession without time for reflection, the Ninth Circuit has applied the "purpose to harm" standard

rather than the "deliberate indifference" standard. *See Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017).

Importantly, courts have determined "the parents of a decedent can recover under the substantive due process prong of the Fourteenth Amendment for a loss of familial association when an officer unreasonably kills." *Estate of Kosakoff v. City of San Diego*, 2010 WL 1759455 at *12 (S.D. Cal. Apr. 29, 2010); *Estate of Jacobo v. L.A. County*, 2011 WL 1522345 at *5 (C.D. Cal. Jan. 31, 2011) (explaining a loss of familial association claim may be derivative of another violation of the Fourteenth Amendment); *see also Moreland*, 159 F.3d at 371. As set forth above, here there are material disputes as to the conduct of the decedent and position in which he stood, including whether he could have been positioned in a shooting stance pointing a weapon at Patino. A reasonable jury could find—with facts taken in favor of Plaintiffs—that Patino acted with a purpose unrelated to a legitimate law enforcement objective. *See, e.g., F.C. ex rel. Rios v County. of L.A.*, 2010 WL 5157339, at *5-6 (C.D. Cal. 2010) ("crediting plaintiffs' version of the incident, as the Court must do at the summary judgment stage, the Court concludes that a rational jury could find that [defendants] acted with a purpose to harm unrelated to legitimate law enforcement objectives" if the plaintiffs could show the decedent was shot "as he turned around to run" and did not draw a weapon.)

### 3. Qualified immunity

Defendants contend Patino is entitled to qualified immunity, which protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine of qualified immunity "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Defendants have the burden to prove that officers are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir.2005).

The threshold inquiry to a qualified immunity determination is whether the facts alleged, when

taken in the light most favorable to the plaintiff, demonstrate that the official's conduct violated a statutory or constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the alleged conduct would not be considered a violation, the inquiry stops, and the defense of qualified immunity applies. *See id.* However, if a constitutional violation occurred, the Court must next determine whether the statutory or constitutional right was "clearly established." *Id.* For a constitutional right to be clearly established, it must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

As discussed above, the Court found genuine material disputes as to factors that must be considered in evaluating the reasonableness of an officer's use of force. The Court cannot resolve the parties' dispute as to whether Patino's violated clearly established statutory or constitutional rights of which a reasonable person would have known, in light of the conflicting witness statements and physical evidence concerning whether the decedent was engaged in a crime when the officers arrived, the position the decedent stood in after opening the door, and whether the decedent posed a threat to Patino when he fired the weapon. If a jury were to accept Plaintiffs' version of the facts to be true, Patino would not be entitled to qualified immunity "because it is a violation of clearly established law for an officer to use deadly force against someone who poses no threat of serious harm to the officers or others." *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1086 (9th Cir. 2017) (citation omitted).

As discussed above, the Court found genuine material disputes as to factors that must be considered in evaluating the reasonableness of an officer's use of force. Where such factual disputes remain, qualified immunity is not appropriate. *See, e.g., Lolli v County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003) (finding officers were not entitled to qualified immunity "[b]ecause of the factual disputes that [the plaintiff] has identified"); *M.H. v. County of Alameda*, 62 F. Supp. 3d 1049, 1094 (N.D. Cal. 2014) ("[T]he core issue for Plaintiffs' excessive force claim is a factual determination of … whether that amount of force was excessive given the circumstances. In such situations, a determination on qualified immunity will rarely be appropriate at summary judgment."). Accordingly, Patino is not entitled to qualified immunity.

### C.    Claims arising under California law

Ms. Nash-Perry asserts Defendants are liable for wrongful death based upon both battery and

negligence.  (Doc. 38 at 17-18.)  Similarly, Mr. Okamoto seeks to hold Defendants liable for wrongful death.  (Doc. 1 at 12, Case No. 1:19-cv-1125-LJO-JLT.)

### 1.    Battery- Wrongful Death

Ms. Nash-Perry asserts Defendants are liable for wrongful death from battery.  (Doc. 38 at 17.) Under California law, a battery occurs when: "[a] defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) [the] plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to [the] plaintiff." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526-527 (2009). Thus, when a claim of battery is brought against a police officer, it is analogous to a claim for excessive use of force. *Id.* at 527; *see also Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1272 (1998) (an officer who uses force in the course of an arrest is not liable for battery unless the plaintiff proves that the force used was unreasonable). Consequently, a claim for battery against a peace officer under California law is analyzed under the Fourth Amendment's reasonableness standard.  *Edson*, 63 Cal. App. 4th at 1274; *Saman v. Robbins*, 173 F.3d 1150, 1156-57 & n. 6 (9th Cir. 1999).

Because Defendants fail to show the absence of a dispute of material fact related to the reasonableness of the force used by Patino, summary adjudication of the battery claim is likewise not appropriate.  *See S.T. v. City of Ceres,* 327 F.Supp.3d 1261, 1282 (E.D. Cal. 2018) ("a material issue of fact as to whether the officers' use of deadly force was reasonable that precludes summary judgment on Plaintiff's state law battery [claim]"); *see also Carter v. City of Carlsbad*, 799 F.Supp.2d 1147, 1164(S.D. Cal. 2011) (denying summary adjudication of a claim for battery where the defendants were "not entitled to summary judgment that…. [the] use of force was objectively reasonable").

### 2.    Negligence under California law

Ms. Nash-Perry states a claim for negligence (wrongful death) against the defendants under Cal. Gov't Code § 820.  (Doc. 38 at 18.)  To establish a claim for negligence, Plaintiffs "must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003). In general, "the plaintiff must show that the defendant owed a duty to the plaintiff." *See John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (2006). The existence of a duty is a matter of law for a court to decide, and under California law, police officers have a duty to use

1    reasonable force. *See Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1100 (2004).

2        This standard of "objective reasonableness" under California law is the analog to the standard of

3 reasonableness for Fourth Amendment claims under federal law.  As such, federal cases are

4 "instructive" in deciding whether a given exertion of force is reasonable. *See Brown*, 171 Cal. App. 4th

5 at 534. Under *Brown*, the Court's conclusions regarding the Fourth Amendment claim are equally

6 applicable in addressing the negligence claim. *See id.*, 171 Cal. App. 4th at 534; *see also Young v.*

7 *County of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011). Because disputes of fact related to the

8 reasonableness of the force used by Officer Patino preclude a determination on the negligence claim,

9 Defendants' motion for summary adjudication on this cause of action is denied. *See S.T.,* 327

10 F.Supp.3d at 1282 ("a material issue of fact as to whether the officers' use of deadly force was

11 reasonable that precludes summary judgment on Plaintiff's state law… negligence claims").

12                   <u>3.     Privilege for state claims</u>

13        Defendants contend "Patino is immune for liability for the state law claims."  (Doc. 61-1 at 32.).

14 Defendants observe, "Under California law, a statutory privilege defeats all tort claims, including

15 negligence claims."  (*Id*., quoting *Gilmore v. Superior Court*, 230 Cal.App.3d 416, 421-422 (1991).)

16 Defendants observe that the state court determined, "When the defendant has been justified in the use

17 of deadly force against the decedent, the privileged nature of the conduct is a defense to all civil

18 liability regardless of the plaintiff's status."  (*Id.*, quoting *Horwich v. Superior Court*, 21 Cal. 4th 272,

19 285 (1999).)  Defendants also observe that "Cal. Penal Code § 196 establishes a privilege for peace

20 officers to use deadly force," the test for which "is the same as the test for when deadly force is

21 reasonable under the Fourth Amendment."  (*Id.*, citing, e.g., *Brown v. Ransweile*r, 171 Cal.App.4th 516

22 (2009); *Gilmore*, 230 Cal.App.3d at 416.)  Specifically, a homicide is justifiable under Section 196

23 when "the circumstances reasonably created a fear of death or serious bodily harm to the officer or

24 another.  *Martinez v. City of Los Angele*s, 47 Cal. App. 45h 334, 338 (1996).

25        As Defendants acknowledge, the test for whether the privilege under Section 196 applies is the

26 same test applied by the Court in addressing force used under the Fourth Amendment.  As discussed

27 above, the Court determined there are material disputes of fact related to whether the force exerted was

28 reasonable, and summary judgment is not appropriate on the Fourth Amendment claim.  Likewise, the

Court finds application of the privilege under Section 196 is not appropriate, as Defendants have not shown a "justifiable homicide." *See Shannon v. City of Sacramento*, 2018 WL 3861604 (E.D. Cal. Aug. 13, 2018) (explaining that if the offers did not act reasonably, Section 196 does not bar a plaintiff's claim and denying summary judgment "[g]iven the record, in which virtually all evidence comes from the officers' potentially self-serving testimony").

## V.     Conclusion and Order

Given the conflicting evidence presented by the parties related to the circumstances of the decedent's encounter with Officer Patino and the reasonableness of the force exerted—and the inferences that must be taken in favor of Plaintiffs— Defendants have not met the burden to show an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  A jury must make credibility determinations and resolve the conflicts between the evidence. *See T.W. Electrical Serv., Inc.*, 809 F.2d at 630.  Based upon the foregoing, the Court **ORDERS** the motion for summary judgment (Doc. 61) is granted in part as follows:

1.     The motion for summary adjudication of the claims of Z.S. is **GRANTED**; and

2.     The motion for summary adjudication of all claims raised by Ms. Nash Perry and Mr. Okamoto is **DENIED**.

IT IS SO ORDERED.

Dated:   **August 31, 2021**                 _____ **/s/ Jennifer L. Thurston**
                                                        CHIEF UNITED STATES MAGISTRATE JUDGE