UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAMETRIA NASH-PERRY, <br><br>    Plaintiff, <br><br>    v. <br><br>CITY OF BAKERSFIELD, et al, <br><br>    Defendants. <br><br>JASON OKAMOTO, et al., <br><br>    Plaintiffs, <br><br>    v. <br><br>CITY OF BAKERSFIELD et al., <br><br>    Defendants. | Case No.: 1:18-cv-01512 JLT CDB <br><br> ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW <br><br>(Doc. 172) |

Tametria Nash-Perry and Jason Okamoto seek to hold Bakersfield Police Officer Alejandro Patino and the City of Bakersfield liable for the fatal shooting of Christopher Okamoto under federal and state law. (*See generally* Docs. 38, 44.) The Court held a jury trial in this action. At the close of Plaintiffs' evidence, Defendants made an oral motion for judgment as a matter of law, which was taken under submission. (*See* Doc. 149.) After the jury was unable to reach a unanimous verdict, the Court declared a mistrial. (Doc. 157.) Defendants now renew their motion for judgment as a matter of

1

law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.  (Doc. 172.)  Plaintiffs oppose the motion, asserting a reasonable jury could find in their favor.  (Doc. 174.)  For the reasons set forth below, the motion is **DENIED**.

I.     **Background and Trial Evidence[1]**

On August 19, 2018, Christopher Okamoto was 21 years old and lived with his girlfriend Britney Saucedo and her infant daughter at 4809 Hahn Avenue, apartment number 46.  (Doc. 172-1 at 8-9, citations omitted.)  At the time of the events, Saucedo reported that she and Okamoto were drinking, and Okamoto was drunk.  (Doc. 172-2 at 23.)  She also testified they were arguing that night.  (*Id.* at 27.)

Edward White and Melissa Contreras, who lived in the apartment next door, heard Okamoto and Saucedo arguing.  (Doc. 172-2 at 34-35, 48.)  White testified he heard arguing "throughout the whole day."  (*Id.* at 9.)  Contreras reported that she fell asleep and "woke up to loud noises."  (*Id.* at 48.)  Contreras testified, "there was like yelling and there was a struggle.  There was just like a whole lot of movement going on."  (*Id.*)  White also stated that "it sounded like they were grabbing each other," and there was "furniture being moved around the house."  (*Id.* at 42.)  He said it sounded like "somebody wrestling against the wall."  (*Id.*)  Contreras asked White to call the police, and he called 911 at 11:27 p.m.  (*Id.* at 38-40, 48.)  In the 911 call, White told the dispatcher that he believed the female in the apartment was being choked.  (*Id.* at 43, 49.)

Bakersfield Police Officers Patino and Celedon were dispatched in response to the call.  (Doc. 172-2 at 9, 54.)  The dispatch transmission directed the officers to "respond to a 273.5 in progress," which Patino explained is the "code for domestic violence."  (*Id.* at 79; *see also* Doc. 172-1 at 9.)  Dispatch indicated "a male was choking a female." (*Id.*)  Celedon arrived first at the apartment complex with his canine partner, and Patino arrived shortly after at approximately 11:34 p.m.  (*Id.* at 9, 54.)

Patino and Celedon looked for apartments 43 and 45—the apartment numbers erroneously identified by dispatch—when White encountered the officers and "pointed them in the right direction to Apartment 46."  (Doc. 172-1 at 9-10; *see also* Doc. 172-2 at 54-55.)  After White directed Patino

---

[1] The Court's summary of the facts follows the appropriate standards for reviewing the evidence on a Rule 50(b) motion, in the light most favorable to the non-moving party.

2

and Celedon to apartment 46, he walked back to his own apartment. (Doc. 172-2. at 56.) The officers did not get any information directly from White regarding what was occurring in the reported apartment, or ask any details regarding the call received from dispatch. (*Id.* at 55.) It took approximately one minute, or less, from the time the officers encountered White to the time he returned to his own apartment. (*Id.* at 56.)

The officers did not speak about a tactical plan before walking toward apartment 46, which was on the second floor at the complex. (Doc. 172-2 at 56; Doc. 174-1 at 8.) Patino started up the stairs first, and Celedon followed taking the position of a cover officer. (Doc. 172-2 at 10-11.) Celedon explained that as a cover officer, his responsibility was to be in a position to assist Patino "in the event … [his] life was threatened or in danger." (*Id.* at 11.) Patino estimated that from the time they encountered White to the time he arrived at the top of the stairs was "about 30 seconds to a minute." (*Id.* at 56; *see also* Doc. 174-1 at 8.) There was a landing at the top of the stairs in front of apartment 46, which Patino estimated to be about five feet long, though Patino acknowledged it could be a bit larger or smaller. (*Id.* at 57.)

Patino testified that when he arrived on the scene, he did not hear any sounds that reflected someone was being choked. (Doc. 174-1 at 17.) He said he heard sounds of arguing for ten seconds or less, but he could not decipher anything being said. (*Id.* at 10.) Patino reported that he rang the doorbell and pounded on the door with his fist. (*Id.* at 61-62.) Patino said he heard a thud inside the apartment and said something to Celedon, but did not radio for backup. (*Id.* at 10-11.)

Saucedo stated that Okamoto was awake when they heard the knock on the door.[2] (Doc. 172-2 at 30.) She later told the police that Okamoto was angry and mad when they heard a knock on the door. (*Id.* at 26.) Okamoto yelled statements to the effect of, "Who the fuck is at my door?" (*Id.* at 22, 45, 61.) Okamoto retrieved his gun from a closet, and ran to the door. (*Id.* at 21.) Saucedo stated that she saw Okamoto "raising his gun." (*Id.* at 22.) It is now undisputed that Okamoto held, what

---

[2] This testimony is contrary to her declaration submitted in support of the motion for summary judgment, in which Saucedo stated Okamoto was awakened by the banging on the door. At the trial, Saucedo testified that statement in her declaration was "not true." (Doc. 172-2 at 30.) The Court has serious reservations about Ms. Saucedo's ability and/or competency to testify truthfully at a future trial and whether, within the bounds of attorney ethics, she can be called to testify. Indeed, during trial, Plaintiff's counsel stated at sidebar that Ms. Saucedo "is a 'yes' sayer. She says 'yes' to everything." (Doc. 153 at 57)

3

appeared to be a real gun, but it was not.

Patino testified he heard steps coming toward the door and could see the handle turn through the security door. (Doc. 172-2 at 64.) Patino reported that when the door cracked open, he saw the muzzle of a gun—which he believed was "a real firearm"— pointed at him. (*Id.* at 64-65.) According to Patino, once the door opened completely, Okamoto stood with his "right arm fully extended out," with his "right shoulder ahead of his left shoulder." (*Id.* at 66.) Patino stated Okamoto's gun was pointed at his head. (*Id.* at 77.) From his perspective, Celedon did not see Okamoto holding a firearm. (Doc. 174-1 at 31.)

Patino reported that when he saw the muzzle of Okamoto's gun, his own gun was still holstered. (Doc. 172-2 at 67.) He said it took a "split second" and was a "quick process" to unholster his weapon. (*Id.* at 67-68.) When he unholstered his gun, he activated the flashlight on the weapon, which was done "just by tightening [his] grip on it with [his] middle finger." (*Id.* at 67.) Patino did not retreat or give any verbal commands to Okamoto after he saw the gun. (*Id.* at 68, 77.)

Patino fired six times at Okamoto in a first volley of shots. (Doc. 172-2 at 71.) He estimated the barrel of his gun was about three feet from Okamoto during this first volley. (*Id.* at 72.) Patino testified that "Okamoto took a step back," after which Patino paused. (*Id.* at 73.) Patino testified Okamoto's arm remained "fully extended" and the firearm was "still … in the same position," pointed at him. (*Id.* at 73-74.) Patino then fired a second volley of shots. (*Id.*) Between the two volleys of shots, there were no verbal communications between Okamoto and Patino. (*Id.* at 75.)

Dr. Robert Whitmore, a forensic pathologist, performed the autopsy on Okamoto. (Doc. 176 at 4.) Okamoto was shot six times, and Dr. Whitmore identified entrance wounds on the anterior left trapezius muscle (which he explained was the front side of the neck), the anterior left shoulder, and the anterior left upper arm. (*Id.* at 20.) Dr. Whitmore explained that aside from the primary entrance wounds there were smaller fragment wounds, which he attributed the bullets traveling through the screen door before striking Okamoto. (*Id.* at 18.) He also identified "a graze gunshot wound" on Okamoto's right cheek. (*Id.* at 19, 28.) There were no injuries or trauma to Okamoto's right arm or hand. (*Id.* at 29.) Dr. Whitmore concluded the cause of death was "multiple gunshot wounds" and "manner of death is homicide, death at the hands of another." (*Id.* at 7.)

1  The Court held a trial beginning on January 9, 2023. Prior to the matter going to the jury, Defendants moved for judgment as a matter of law under Rule 50(a). (Doc. 149.) The motion was taken under submission by the Court. (*Id.*) After the jury could not reach a unanimous verdict, the Court declared a mistrial on January 19, 2023.[3] (Doc. 157.)

On February 14, 2023, Defendants renewed their motion for judgment as a matter of law under Rule 50(b). (Doc. 172.) Plaintiffs filed their opposition to the motion on March 2, 2023 (Doc. 174), to which Plaintiffs filed a reply on March 10, 2023. (Doc. 177.)[4] Defendants also filed a notice of new case authority in support of the motion on June 5, 2023. (Doc. 182.)

**II.  Legal Standard**

The Federal Rules of Civil Procedure provide for judgment as a matter of law where a party, "fully heard on an issue during a jury trial," has not established a "legally sufficient evidentiary basis" for its claim, such that no "reasonable jury" could find for that party on the issue. Fed. R. Civ. P. 50(a)(1); *see also El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1072 (9th Cir. 2005). A motion for judgment as a matter of law under Rule 50(a) "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). In addition, the motion must be made before the case is submitted to the jury. *Id.* If the court does not grant a Rule 50(a) motion during a trial, the matter is deemed submitted to the jury "subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P 50(b).

When, as here, a jury does not reach a verdict, a party may renew the motion post-trial within

---

[3] After the Court declared a mistrial, the parties were permitted to speak to the juror members who were willing to stay for discussions. Defendants report—and Plaintiffs do not dispute—that "before reaching a deadlock on the Plaintiffs' negligence claim, the jury at trial concluded that officer Patino's use of force did not violate the Fourth Amendment." (Doc. 172-1 at 13.)

[4] In the reply, Defendants argue the Court should disregard the opposition because it was untimely. (Doc. 177 at 2-3.) Defendants note that pursuant to Local Rule 230(b), any opposition was due within 14 days of the motion being filed, and the Local Rule indicates that "[a] failure to file a timely opposition may also be construed by the Court as a non-opposition to the motion." (*Id.* at 3, emphasis omitted.) As Defendants argue, because the motion was filed on February 14, 2023, the opposition to the motion was due no later than February 28, 2023. *See* L.R. 230(b). However, the Court notes that Defendants were able to respond to all arguments made in the opposition. (*See* Doc. 177 at 3-6.) Accordingly, the Court exercises the discretion available under Local Rule 230 and declines to strike the document as untimely. Nevertheless, Plaintiffs are cautioned that future failure to comply with deadlines imposed by the Local Rules and orders may result in the imposition of sanctions, including the striking of untimely documents.

5

28 days of the jury being discharged. Fed. R. Civ. P 50(b). Thus, Rule 50(b) permits a renewed motion even if the Court declares a mistrial. "[A] jury's inability to reach a verdict does not necessarily preclude judgment as a matter of law." *Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010) (citation omitted); *González-Pérez v. Gómez-Aguila*, 312 F.Supp.2d 161, 164 (D.P.R. 2004) (same).

A party seeking judgment as a matter of law has a "very high" burden to meet. *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002). Evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000); *see also EEOC v. Go Daddy Software, Inc.,* 581 F.3d 951, 961 (9th Cir. 2009). However, "a reasonable inference cannot be supported by only threadbare conclusory statements instead of significant probative evidence." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802-03 (9th Cir. 2009) (internal quotations omitted). The Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." *Harper v. City of L.A.*, 533 F.3d 1010, 1021 (9th Cir. 2008). The Supreme Court recently explained this analysis "largely mirrors the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731-32 (2023) (internal quotation marks, citation omitted).

### III.     Discussion and Analysis

Tametria Nash-Perry and Jason Okamoto are the parents of Christopher Okamoto, and assert the defendants are liable for the wrongful death of their son. Plaintiffs assert claims for unreasonable use of force/excessive force, violation of substantive due process, interference with familial relationship, battery- wrongful death, and negligence- wrongful death. (*See* Docs. 38, 59-60; Doc. 1, Case No. 1:19-cv-1125-LJO-JLT.) Defendants now renew their motion under Rule 50(b), asserting no reasonable jury could conclude the use of deadly force was unreasonable or that Patino acted negligently. (*See generally* Doc. 172-1 at 9-22.) Defendants argue that because Plaintiffs' claims under the Fourth and Fourteenth Amendments fail, the claim for battery also fails. (*Id.* at 18.)

#### A.     Conflicting testimony of Saucedo

As an initial matter, Defendants contend the Court was previously "completely mislead by a patently false declaration from Brittney Saucedo (which was authored by Plaintiffs' counsel)" in

6

addressing the motion for summary judgment. (Doc. 172-1 at 6.) To the extent Defendants suggest the Court make a credibility determination in evaluating Saucedo's testimony—both in writing and at trial—the Court declines to do so. *See Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014) ("the court may not make any credibility determinations" with a Rule 50(b) motion).[5] Nevertheless, the Court notes the conflicting testimony, such as whether Okamoto was asleep or awake before Patino knocked on the apartment door, does not bear on its analysis below.

### B. Claims arising under Section 1983

Plaintiffs seek to hold Defendants liable for civil rights arising under the Fourth and Fourteenth Amendments to the Constitution of the United States, pursuant to 42 U.S.C. § 1983. (*See* Doc. 38 at 10-28; Case No. 1:19-cv-1125-LJO-JLT, Doc. 1.) Section 1983 "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must establish a specific injury was suffered and show a causal relationship between the defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). In other words, "[s]ome culpable action or in action must be attributable to defendants." *See Puckett v. Corcoran Prison - CDCR*, 2012 WL 1292573, at *2 (E.D. Cal. Apr. 13, 2012).

---

[5] See fn. 2.

7

### 1. Use of force under the Fourth and Fourteenth Amendments

The Supreme Court determined the Due Process Clause of the Fourteenth Amendment protects individuals who have not yet been convicted of a crime "from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 388 (1989). However, allegations of excessive force are analyzed under the Fourth Amendment. *Id.* ("claim[s] that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard"). Accordingly, "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

"An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances." *County of Los Angeles, Calif. v. Mendez*, 481 U.S. 420, 429 (2017). Whether an officer's use of force violates the Fourth Amendment is determined by "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. The Ninth Circuit identified a three-step inquiry to evaluate an officer's particular use of force. *Glenn v. Wash. Cty.*, 673 F.3d 864, 871 (9th Cir. 2011) (citing *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010)). First, the Court considers "the severity of the intrusion … by evaluating the type and amount of force inflicted." *Id.* Second, the Court must "evaluate the government's interest in the use of force." *Id.* (citing *Graham*, 490 U.S. at 396). Third, the Court shall "balance the gravity of the intrusion on the individual against the government's need for that intrusion" to evaluate the overall reasonableness under the circumstances. *Id.* (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). Thus, the Court balances the force used against the need for the use of force. *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997); *Bryan v. MacPherson*, 630 F.3d 805, 823-824 (9th Cir. 2010).

Importantly, "[t]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. July 21, 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] held on many occasions that … judgment as a matter of law

in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations omitted).

### a. Severity of the intrusion

The Ninth Circuit observed that "[t]he police arsenal includes many different types of force, which intrude upon the Fourth Amendment rights of the individual to varying degrees." *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012). In evaluating "the type and amount of force used," the Court must "assess both 'the risk of harm and the actual harm experienced." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, — F.4th —, 2023 WL 6846345 at *9 (9th Cir. Oct. 17, 2023) (quoting *Nelson*, 685 F.3d at 879). "The greater the risk of harm and the actual harm involved, the greater the governmental interest must be to justify the use of force." *Id.* (citing *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002)). As the Supreme Court observed, "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9.

The Ninth Circuit determined "deadly force" includes "any force that *creates a substantial risk* of causing death or serious bodily injury." *Sabbe*, — F.4th —, 2023 WL 6846345 at *9 (quoting *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) [modification in original]). Shooting a firearm "by definition is deadly force." *See Seidner v. De Vries*, 39 F.4th 591, 596 (9th Cir. 2022). Thus, it is undisputed that Patino used deadly, fatal force against Okamoto. As a result, the risk of harm and actual harm suffered by Okamoto were the most significant possible, and the force "must be justified by substantial government interests." *See Nelson*, 685 F.3d at 879; *Garner*, 471 U.S. at 9.

### b. Government's interest

The Supreme Court determined relevant factors to evaluate the government's interest in using force include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee*, 471 U.S. at 8-9); *see also Miller*, 340 F.3d at 964 (indicating courts use the three *Graham* factors to "assess the importance of the government interests at stake").

When an individual dies in a police officer shooting, the Court must "carefully examine all the evidence in the record, including circumstantial evidence, to ensure that the officers are not taking

advantage of the fact that the witness most likely to contradict their story—the person shot dead—is unable to testify." *Sabbe*, — F.4th —, 2023 WL 6846345 at *9 (9th Cir. Oct. 17, 2023) (quoting *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (quotation marks omitted, modifications adopted). The Ninth Circuit explained: "the court may not simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Rather, the evidence—including medical reports, statements by the officer, and available physical evidence—should be carefully examined "to determine whether the officer's story is internally consistent and consistent with other known facts." *Gonzalez*, 747 F.3d at 794-95; *Scott*, 39 F.3d at 915. Nevertheless, the Court must ensure its evaluation of reasonableness of force allows "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 at 396-97; *see also Andrews v. City of Henderson*, 35 F.4th 710, 715 (9th Cir. 2022).

### i. Severity of the crime at issue

Patino reported that the dispatch radio transmission directed the officers to "respond to a 273.5 in progress," which is the "code for domestic violence." (Doc. 172-2 at 79; *see also* Doc. 172-1 at 9.) Domestic violence calls are considered "particularly dangerous" for police officers. *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (acknowledging "more officers are killed or injured on domestic violence calls than on any other type of call"). However, the concern for officer safety is "less salient 'when the domestic dispute is seemingly over by the time the officers being their investigation.'" *George v. Morris,* 736 F.3d 829, 839 (9th Cir. 2013) (quoting *Mattos*, 661 F.3d at 450).

Significantly, it is disputed whether there were sounds of domestic violence coming from the apartment at the time Patino approached the door. A reasonable jury may find that there was no domestic violence occurring, despite that he heard arguing for up to ten seconds and heard a thud inside the apartment (Doc. 174-1 at 10-11), because Patino did not hear any choking sounds did not radio for backup. (Doc. 174-1 at 17.)

### ii. Threat of safety

The "most important" factor is whether the suspect posed an "immediate threat to the safety of the officers or others." *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). Under the objective

test, "a simple statement by an officer that he fears for his safety or the safety of others is not enough." *Deorle*, 272 F.3d at 1281. Objective factors must exist to justify the concern. *Id.* "In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Id.* "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat" may justify the belief of an immediate threat. *George*, 736 F.3d at 838. The perceived threat and response "must be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Boyd v. Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004) (quoting *Graham*, 490 U.S. at 396).

"Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others, or is fleeing and his escape will result in a serious threat of injury to persons." *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997). The Ninth Circuit determined that "when someone points a gun at a law enforcement officer, the Constitution 'undoubtedly entitles the officer to respond with deadly force.'" *Estate of Strickland v. Nevada Cnty.*, 69 F.4th 614, 617 (9th Cir. 2023) (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)). If an officer mistakenly believes a fake gun is real, the use of deadly force may be justified under such circumstances. *Id.*, 69 F.4th at 621-623; *see also County of Los Angeles v. Mendez,* 581 U.S. 420, 425-26 (2017) (observing the Ninth Circuit held a shooting of a person with a BB gun was reasonable given the officers' belief that the individual had a gun and was threatening them, while reversing on other grounds).

The presence of a gun alone does not mandate a determination that an individual posed an immediate threat to safety. *George*, 736 F.3d at 838. There is limited evidence, which predominately comes from Patino, concerning the position of Okamoto when he opened the apartment door. Saucedo testified she saw Okamoto "raising his gun," but did not offer any information regarding whether Okamoto fully raised his arm or whether he pointed it in the direction of the officer. (*See* Doc. 172-2 at 22.) Celedon testified that he did not see a gun pointed at Patino, though the evidence suggests he was in a cover position where a gun may not have been visible to him. (Doc. 174-1 at 30.) There also was no evidence that Okamoto's finger was on the trigger of the gun, which is a relevant factor in determining whether an individual poses an immediate threat. *See Estate of Lopez ex rel. Lopez v.*

*Gelhaus,* 871 F.3d 998, 1010-11 (9th Cir. 2017) (finding that with conflicting evidence concerning the decedent's position, a reasonable jury could find the officer "deployed deadly force without knowing if [the decedent's] finger was on the trigger" of the gun, which was a replica gun that looked like an AK-47, and such supported a conclusion from a reasonable jury that the decedent did not pose an immediate threat).

Plaintiffs also contend the physical evidence, including the autopsy findings and photographs, contradict Patino's claim that Okamoto stood in a one-handed shooting stance and pointed the BB gun at Patino's head. (Doc. 174 at 7, 12.) Plaintiffs assert:

> The physical evidence presented through Dr. Whitmore, show that Christopher Okamoto had four penetrating and perforating gunshot wounds of the anterior left trapezius, anterior left shoulder, and upper anterior left arm associated with fragment wounds. (Ex. F, G & H to RSD Decl.). Additionally, the wounds found in Christopher Okamoto's left trapezius, left shoulder, and left upper arm traveled from the front of Christopher Okamoto's body to the back of Christopher Okamoto's body. (Ex. F, G & H to RSD Decl.).

(Doc. 174 at 12-13.) Plaintiffs assert that the trier of fact could find Patino's testimony regarding Okamoto's position "is not consistent with the location of the fragment wounds found on … Okamoto's body." (*Id.* at 12.)

The evidence taken in the light most favorable to Plaintiffs supports a conclusion that there was no crime in progress, and Okamoto was unaware of who was outside the apartment as Okamoto asked repeatedly.[6] *See, e.g., Cooper v. Sheehan*, 735 F.3d 153, 159-60 (4th Cir. 2013) (holding that officers' use of deadly force was not reasonable, the court noted: "[i]mportantly, the Officers never identified themselves—even when asked" and there was an explanation that a person might carry a firearm while investigating a disturbance on his property). In addition, Patino indicated that he activated the flashlight on his weapon, and a jury may find the light directed at Okamoto precluded him from seeing the officer. The medical and physical evidence could also be interpreted by the jury to support a conclusion that Okamoto was not positioned as Patino testified, and his left side of his upper body—the

---

[6] Saucedo testified that after the shooting, she told the police that she thought it could be somebody there to get Okamoto, or someone there to fight with Okamoto, or the police outside the apartment. (Doc. 172-2 at 26.) This testimony also supports a reasonable inference that Okamoto was unaware it was the police at the door, and did not hear any announcement that it was an officer with the Bakersfield Police Department.

12

only side with bullet entrance wounds— could only have been exposed when turning away from the officer. *See Aguilar v. County of Fresno*, 2010 WL 1267355, at *4-5 (E.D. Cal. Mar. 31, 2010) (denying summary judgment where "the "physical evidence [was] susceptible to at least two interpretations," one of which "can be interpreted to support a factual narrative that contradicts the narrative asserted by Defendants"). Thus, a reasonable jury could conclude there was not an immediate threat to the safety of the officers or others.

### iii. Resistance or fleeing arrest

Defendants contend this factor favors a finding the use of force was reasonable because "Okamoto was actively resisting by failing to open the door and allow for a peaceful investigation/ inquiry." (Doc. 172-1 at 17.) However, as discussed above, the evidence supports a reasonable inference that Okamoto did not know that it was a police officer at the door. It follows that Okamoto was unaware of any instruction to open the door. Thus, a reasonable jury may find Okamoto was not resisting the police when he did not immediately open the apartment door after hearing the banging.

### c. Weighing totality of circumstances

The factors identified in *Graham* are not exhaustive, and courts must examine the totality of the circumstances to determine "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826; *see also Mattos v. Agarano*, 661 F.3d 433, 4421 (9th Cir. 2011) ("in assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated above…"). For example, the Court may consider whether the officers warned that deadly force may be used, whether cover options were available, and whether less-lethal force was available. *See Yearick v. Leatham*, — F.4th —, 2023 WL 5928486, at *2 (9th Cir. Sept. 12, 2023) (addressing the officers' failure to warn and the availability of less-lethal force); *see also Estate of Lopez ex rel. Lopez v. Gelhaus,* 871 F.3d 998, 1013 (9th Cir. 2017) (considering the officer did not warn the decedent deadly force would be used); *Smith v. Cnty of Butte*, 2017 WL 1540315, at *11 (E.D. Cal. Apr. 28, 2017) (on a motion for summary judgment, considering whether cover was available or the officers could retreat, and whether there was a "less lethal force option immediately available"). Considering such additional factors, a reasonable jury may find the use of deadly force was excessive.

The Ninth Circuit indicated that "whenever practicable, a warning must be given before deadly force is employed." *Harris*, 126 F.3d at 1201; *see also Gonzalez*, 747 F.3d at 794 ("[i]n general, we have recognized that an officer must give a warning before using deadly force 'whenever practicable'"). It is undisputed that Patino did not warn Okamoto that he may use deadly force before and firing his weapon. A jury may find the warning was feasible and practicable, given the evidence that Patino had to unholster his weapon and activated the flashlight prior to firing. In addition, while Defendants argue there was no legal obligation to retreat (Doc. 172-1 at 16-17), a reasonable jury may find that Patino had the option to move away from the apartment door for cover prior to using deadly force, given the length of the landing from the stairs to the apartment door.

Taking the evidence in favor of Plaintiffs—as the Court must do in addressing the Rule 50(b) motion—the Court finds a reasonable jury may determine the objective factors did not justify Patino's use of deadly force. Accordingly, Defendants fail to meet their substantial burden to demonstrate judgment as a matter of law is appropriate for Plaintiffs' excessive force claims.

### 2. Due process and familial rights under the Fourteenth Amendment

The Supreme Court explained: "[T]he freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights." *Board of Directors of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 544 (1987). Consequently, there is a constitutionally protected liberty interest in the companionship and society of a parent and child. *Ward*, 967 F.2d at 283; *Lemire*, 726 F.3d at 1075; *see also Venerable v. City of Sacramento*, 185 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002). Thus, "[a] substantive due process claim may be asserted by … the parents and children of a person killed by law enforcement officers." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998).

To establish a claim for interference with familial rights under Section 1983, a plaintiff must show "the defendant acted with deliberate indifference to these rights." *Venerable*, 185 F. Supp. 2d at 1131; *see also Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998) ("to prove their Fourteenth Amendment claim, [plaintiffs] had to prove that the Officers acted with deliberate indifference to [their] rights of familial relationship"). This may be established where the officer's conduct "shock[ed] the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1989); *see also Porter v. Osborn*, 546

F.3d 1131, 1137 (9th Cir. 2008). The Ninth Circuit explained a court must first inquire "whether the circumstances are such that actual deliberation [by the officer] is practical." *Id.* The Court explained:

> Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). When an officer's actions come in rapid succession without time for reflection, the Ninth Circuit has applied the "purpose to harm" standard rather than the "deliberate indifference" standard. *See Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017).

Defendants argue that even if the Court were to find a reasonable jury could conclude Patino used excessive force, "Plaintiffs cannot prove that Officer Patino's conduct 'shocks the conscious'." (sic) (Doc. 172-1 at 19.) Importantly, however, courts have determined "the parents of a decedent can recover under the substantive due process prong of the Fourteenth Amendment for a loss of familial association when an officer unreasonably kills." *Estate of Kosakoff v. City of San Diego*, 2010 WL 1759455 at *12 (S.D. Cal. Apr. 29, 2010); *Estate of Jacobo v. L.A. County*, 2011 WL 1522345 at *5 (C.D. Cal. Jan. 31, 2011) (explaining a loss of familial association claim may be derivative of another violation of the Fourteenth Amendment); *see also Moreland*, 159 F.3d at 371. Based upon the inferences that may be made—including that Okamoto was not standing in the manner identified by Patino, with a gun pointed toward Patino—a reasonable jury could find that Patino acted with a purpose unrelated to a legitimate law enforcement objective. *See, e.g., F.C. ex rel. Rios v County. of L.A.*, 2010 WL 5157339, at *5-6 (C.D. Cal. 2010) ("crediting plaintiffs' version of the incident, as the Court must do…, the Court concludes that a rational jury could find that [defendants] acted with a purpose to harm unrelated to legitimate law enforcement objectives" if the plaintiffs could show the decedent was shot "as he turned around to run" and did not draw a weapon). Consequently, a reasonable jury may find the actions of Patino shock the conscience and the motion for judgment as a matter of law for Plaintiffs' Fourteenth Amendment claim is denied.

///

**C.     Claims arising under state law**

Plaintiffs also raised claims for violations of California law. Ms. Nash-Perry asserts Defendants are liable for wrongful death based upon both battery and negligence-wrongful death. (Doc. 38 at 17-18.) Mr. Okamoto also seeks to hold Defendants liable for wrongful death. (Doc. 1 at 12, Case No. 1:19-cv-1125-LJO-JLT.)

1.     Battery- wrongful death

Under California law, a battery occurs when: "[a] defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) [the] plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to [the] plaintiff." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526-527 (2009). However, a claim for battery by a police officer requires the plaintiff to show the force used was unreasonable. *Murchison v. County of Tehama*, 69 Cal. App. 5th 867, 989 (2021). As a result, courts have repeatedly determined that a claim for battery uses "the same standard applied to section 1983 claims." *See, e.g., id.* (citing *Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1274-75 (1998)); *Uzon v. City of Santa Monica*, 54 F.4th 595, 596 (9th Cir. 2022) ("Under California law, when an alleged battery was committed by a police officer, the plaintiff must prove unreasonable force") (citation omitted); *Reyes v. City of Santa Ana*, 832 Fed. App'x 487 (9th Cir. 2020) ("the reasonableness standard applied to state law battery by a peace officer matches the reasonableness standard used for Fourth Amendment excessive force").

Because the standard for battery by an officer is the same as an excessive force claim under Section 1983, if a plaintiff fails to establish an officer used excessive force, then the officer is not liable for battery. *Saman v. Robbins,* 173 F.3d 1150, 1157 (9th Cir. 1999) (finding a plaintiff's claim for battery failed where no reasonable jury could find the officer's actions were objectively unreasonable). Put another way, an officer liable for excessive force is also liable for battery. *See, e.g., Estate of Casillas v. City of Fresno*, 2019 WL 2869079, at *21 (E.D. Cal. July 3, 2019) (finding that "when the jury found [the officer] used excessive force, this decided liability in Plaintiffs' favor under both 42 U.S.C. § 1983 and California battery"). As discussed above, a reasonable jury may find the deadly force used by Patino was excessive. Consequently, a reasonable jury may also find Patino is liable for battery under California law, and judgment as a matter of law on the claim is not appropriate.

### 2. Negligence under California law

Ms. Nash-Perry states a claim for negligence (wrongful death) against the defendants under Cal. Gov't Code § 820. (Doc. 38 at 18.) To establish a claim for negligence, she "must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003). In general, "the plaintiff must show that the defendant owed a duty to the plaintiff." *See John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (2006). The existence of a duty is a matter of law for a court to decide, and under California law, police officers have a duty to use reasonable force. *See Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1100 (2004). Officers also "have a duty to use reasonable care in deciding to use and in fact using deadly force. An officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 519 (2009).

Defendants argue they are entitled to judgment as a matter of law because "there was no evidence to support … [the] cause of action" for negligence. (Doc. 172-1 at 21.) Defendants observe that under California law, "The reasonableness of the deputies' preshooting conduct should not be considered in isolation, however; rather, it should be considered as part of the totality of circumstances surrounding the fatal shooting." (*Id.*, quoting *Hayes v. Cty of San Diego*, 57 Cal. 4th 622, 637-638 (2013).) Defendants note also that in *Hayes* the court determined a plaintiff should not be permitted "to litigate each decision in isolation when each is part of a continuum of circumstances surrounding a single use of deadly force by the deputies." (*Id.*) Defendants assert that "Patino's conduct, including pre-shooting conduct, was objectively reasonable" and there was "insufficient evidence to conclude otherwise." (*Id*) According to Defendants:

> Officer Patino arrived on the landing and made numerous loud announcements as to who he was and what Mr. Okamoto needed to do (open the door). Even when confronted with Mr. Okamoto's refusal to open the door and his aggressive retort as to "who the fuck was at the door", Officer Patino again banged on the door and announced "Bakersfield Police Department". No reasonable officer would have stood in front of the peep hole to allow the occupant to gain a tactical advantage and shoot him. No one testified that he should have done that. Instead, the 20/20 hindsight opinion by Plaintiffs' expert was that Officer Patino should have hid against the wall. This opinion, of course, gave no consideration to the possibility that Mr. Okamoto could have opened the screen door and shot Officer Patino (or even shot him through the door or wall).

(*Id*, citing RT 01-11-2023, p. 117:11-119:7 [Doc. 172-2 at 12-14].)  Defendants conclude that "Patino's conduct was entirely reasonable given the circumstances he was confronted with and no reasonable jury could conclude that Officer Patino's conduct was negligent." (Doc. 172-1 at 22.)

Plaintiffs argue the Court should decline judgment as a matter of law on the negligence claim, because "[a] reasonable jury could find that Officer Patino's conduct was not reasonable…." (Doc. 174 at 16-17.)  Plaintiffs maintain that "Patino is not credible," and his "recollection of the incident contradicts the physical evidence presented by the medical examiner, Dr. Whitmore." (*Id.* at 17.) Plaintiffs note that Patino testified he "acted[] within a split second" and "did not call for back-up." (*Id.*)  Furthermore, Plaintiff's argue, "Patino did not set forth a tactical plan at any time while on the landing or while approaching the apartment unit."  (*Id.*; *see also* Doc. 174-1 at 10-11, 14.)  Plaintiffs contend in light of this testimony, a reasonable jury could find Patino was negligent and did not act reasonably in shooting Okamoto.  (*Id.*)

The standard of "objective reasonableness" under California law is the analog to the standard of reasonableness for Fourth Amendment claims under federal law.  As such, federal cases are "instructive" in deciding whether a certain use of force is reasonable.  *See Brown*, 171 Cal. App. 4th at 534.  Under *Brown*, the Court's conclusions regarding the Fourth Amendment claim are equally applicable in addressing the negligence claim.  *See id.*; *see also Young v. County of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011) (a breach of the Fourth Amendment establishes a breach of the officer's duty of care under California law); *Reed v. City of Modesto*, 112 F.Supp. 3d 967, 982 (E.D. Cal. 2015) ("the Fourth Amendment excessive force violation is sufficient to constitute negligence under California law").  Accordingly, considering the totality of the circumstances in the manner most favorable to Plaintiffs[7]—including the fact the officers did not develop a tactical plan, Patino did not call for backup, and did not retreat behind the wall—a reasonable jury could also conclude Patino breached his duty to act with reasonable care and was negligent.  Consequently, judgment as a matter of law on the negligence claim is denied.

---

[7] The Court is mindful that the standard is not how the Court would decide the facts of the case or whether a party has shown a *more* reasonable explanation of the evidence. Rather, the standard is whether no reasonable jury could conclude that liability may be imposed in this case. Simply put, the Court cannot make that finding.

### IV. Conclusion and Order

For the foregoing reasons, Defendants' motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure (Doc. 172) is **DENIED**.

IT IS SO ORDERED.

Dated:  __October 26, 2023__                     _____
                                                 UNITED STATES DISTRICT JUDGE